No. 12,519.

PEOPLE EX REL. COLORADO BAR ASSOCIATION *v.* GINSBERG.

(285 Pac. 758)

Decided February 17, 1930.

Mr. ROBERT E. WINBOURN, Attorney General, Mr. CHARLES ROACH, Deputy, Mr. OLIVER DEAN, Assistant, for petitioner.

Mr. EDWARD M. SABIN, Mr. JOHN C. VIVIAN, for respondent.

*En Banc.*

MR. JUSTICE ADAMS delivered the opinion of the court.

THIS is an original proceeding brought in this court, in the name of the people, on the relation of the Colorado Bar Association, against Charles Ginsberg, respondent, to disbar him from practicing as an attorney and counsellor at law in the courts of this state, or to otherwise discipline him for gross professional misconduct.

The original petition contained four charges which for brevity, the Attorney General has referred to as: (1) The Bixby charge; (2) the Levy charge; (3) the Dunklee charge; and (4) the Williams charge. We shall so designate them. After the petition was filed in this court, a fifth charge was added, which will be known as the Flower charge. It was based on a communication from one J. S. Flower, written shortly after this proceeding was commenced. It came into the hands of the committee on grievances of the Colorado Bar Association, and in view of this action pending, it was forwarded to us without recommendation. We referred it to the Attorney General with directions that it be added to the petition by way of amendment, so that all charges against respondent could be considered and disposed of at one time.

By stipulation between respondent and the Attorney General, the cause has been submitted on the evidence taken before the grievance committee, except as to a portion of the evidence in the Dunklee charge, which was taken before a duly appointed referee. No evidence was taken in the Flower matter.

The substance of the Bixby charge will for convenience be divided into two sections. The first one shows, in connection with the evidence, that respondent caused to be published in the "want-ad" columns of a Denver daily newspaper, an advertisement reading: "If you need any cash on Western Securities Paper, see 506 Symes Building." This was run for 34 consecutive insertions except Sundays, from July 20, 1927. The address given was the office of respondent, and the words, "Western Securities Paper," referred to certain obligations of the Western Securities Investment Company, a corporation, which was then in financial difficulties. Immediately after the ad appeared, Bixby, a solicitor for a rival newspaper, went to respondent's office to get an advertisement for the latter paper, but respondent refused to comply with the request. Respondent admits the charge this far.

The second section of the first count is to the effect that when Bixby called at respondent's office, the latter requested Bixby to obtain for respondent, three claims against the Western Securities Company, which respondent said he wanted to use for the purpose of filing a petition in bankruptcy against that company. That respondent agreed to pay Bixby the sum of ten dollars each on delivery of the claims, and that thereafter Bixby obtained three claims against the corporation and delivered them to respondent. Bixby testified to this effect, except that instead of delivering claims, he says he got three *names* of such creditors, without their addresses, and left them with respondent; that he went back later and tried to collect, but that respondent refused to pay, giving as a reason that the claimants would not act. Re-

spondent denies that he had any such conversation with Bixby. It is not claimed that such claims or names were actually used in bankruptcy proceedings. Bixby said he could not recall the names.

Respondent says that his purpose in running the advertisement was to make an investment by buying claims from persons who did not wish to wait for their money, and that he spent about $6,000 for such claims. Respondent says that when Bixby called on him, bankruptcy proceedings were not contemplated. 'He also showed that on July 7, 1927, before respondent's advertisement commenced, E. J. Carlin brought an equity suit against Western Securities and another company in the Colorado federal court, under which Louis Eppich was appointed receiver, and that George Shaw was the receiver's attorney. This litigation later resolved itself into bankruptcy proceedings against the securities company in the same court, but we pass over the details, because it is not claimed that any of the three names that Bixby says he got for respondent, or any included in respondent's $6,000 investment, were instrumental in causing bankruptcy. The contrary appears from the .testimony.

The second count concerns the Levy charge. In a sense, this is a misnomer, for Levy has made no accusation. In August, 1928, respondent was acting as attorney for one Beck, receiver for the Colorado Pulp and Paper Company, under proceedings in the district court of Adams county. About that time, the court ordered the receiver to pay off certain pulp company bonds, of the face value of $10,000, and respondent was ordered to take them up and redeem them at their face value. Thereafter respondent bought $5,000 face value of the bonds from one Maurice Levy for the sum of $4,200 and immediately afterwards obtained from the receiver the sum of $5,000 therefor. It is further claimed that respondent did not fully advise Levy concerning the value of the bonds, but wilfully caused and permitted Levy to believe

that it was doubtful whether or not the bonds would be redeemed at their face value. Respondent admits all of the above except the part relating to his alleged misrepresentation and concealment.

Levy made an affidavit on respondent's behalf, which is accepted as evidence. Respondent testified for himself, and there were no other witnesses to the immediate transaction between the two. Their evidence does not conflict, it varies only in details.

Respondent was not Levy's attorney; the latter was represented by attorney Max Zall. Levy had had a previous offer of $4,000 for the bonds. He went to respondent about it, and told him that he, Levy, had been advised that some agreement had been made, but was not satisfied that it would be carried out, as many previous agreements had been made. Levy had previously negotiated with respondent concerning the bonds. Levy then went to respondent who told him that a stipulation had been entered into for their immediate payment and that in respondent's opinion, the bonds would be paid. Levy told respondent that he was determined to sell the bonds at once. Respondent said he did not desire to bid on them, but Levy offered to take $4,200, which respondent accepted and paid Levy the money. Respondent afterwards discussed the matter with an attorney friend of his who told him that in his opinion the transaction was unethical, and that respondent should have been more insistent in advising Levy not to sell the bonds. Acting on this advice, respondent voluntarily paid the sum of $800 to Levy.

The third count, known as the Dunklee charge. In the year 1928, an action for alleged criminal conspiracy against certain defendants was pending in the criminal division of the district court of the City and County of Denver, then presided over by the Honorable George F. Dunklee, judge thereof. Special prosecutors had been appointed, to assist the district attorney. It is claimed that respondent requested the judge to appoint him as

120

one of the special prosecutors, which the judge refused to do. Subsequently, the defendants petitioned for a change of judge on the ground of prejudice, supported by numerous affidavits which were met with counter affidavits. Respondent was not an attorney in that cause, but made an affidavit on behalf of petitioners, and the judge himself made an affidavit. After considering them all, the petition for change of judge was denied. Later, the defendants petitioned this court for a writ of prohibition, which we denied. *People v. District Court,* 84 Colo. 367, 270 Pac. 663. It is charged that respondent's affidavit contained malicious statements against the judge, falsely attributing to him certain remarks (which if true, would disqualify him to sit on the case), and that respondent's affidavit was caused by disappointment at not being appointed one of the special prosecutors. Respondent's affidavit in fact contained statements of alleged remarks by the judge to respondent, which, if true, would disqualify the judge, but respondent continues to assert that such remarks were made.

The fourth count, the Williams charge. Williams is an attorney at law. In December, 1928, he and respondent were on opposite sides of a case then being tried in the court house at Golden, Colorado. It is alleged that respondent, without just provocation, while the trial was in progress, twice called Williams a liar, and at its close, made a brutal, wanton, unprovoked and vicious assault on Williams outside the court room door, in the course of which respondent with his fist struck Williams several times, knocking him down and severely wounding him. Respondent did call Williams a liar and the court demanded an apology, which respondent tendered. Respondent admits that he hit Williams once, but claims that his acts and remarks were not without provocation. Respondent denies malice and says that it was done in the heat of an altercation between the attorneys, but respondent respectfully submits that he should not have struck Williams. He says that Williams had stated that

certain remarks made by respondent were not true, and that he knew it, which provoked him to natural anger. Williams states that a gentleman afterwards called at his office and said that respondent desired to apologize, but that he (Williams) never replied to the offer.

Fifth, the Flower charge. This relates to alleged professional misconduct on respondent's part in appearing as attorney and witness about a claim of the firm of Fox and Goldberg, against Flower as receiver. It was in a cause wherein respondent had formerly been receiver, but was subsequently discharged, and Flower appointed as his successor. This charge came forward too late for action by the grievance committee, respondent has answered, but no evidence was taken, and the Attorney General does not press it. In view of these circumstances, it will not be considered.

1. Before discussing the several charges, we shall mention the general standards applicable to the case as a whole, by which we are governed in our conclusions. It is a splendid tribute to the legal profession that it is looked to by the better element of society for qualities of leadership, and disappointments are the exception. An elevated conception of professional obligation is essential. Canons of professional ethics were long ago adopted by the American Bar Association, and are set forth on pages 769-782, vol. 53, of the reports of the association, for the year 1928. As there said, they do not deny the existence of others equally imperative, though not specifically mentioned. They have been widely followed in other states, and by our rule 83e, they are recommended as a standard of professional conduct. This court has considered them of such great importance as to have been printed as an appendix to the 1924 and 1929 editions of our rules. We deem it highly essential to refer to these canons of ethics, at least by general reference. We supply the clerks of district courts with a sufficient number of these rules for distribution to all attorneys in the several districts. They are printed for

their use and guidance, and the committee on grievances of the Colorado Bar Association has fearlessly and unselfishly undertaken to assist in the promotion of our canons of ethics, without hope of pecuniary reward.

2. As to the first section of the first count, the Bixby charge. If respondent's statement is correct that his advertisement for Wester Securities paper was only for the purpose of making a personal investment, it does not justify the act. For a lawyer to advertise for claims against others, whether they are in financial difficulties or not, tends to bring reproach on the legal profession. Such conduct is grossly unethical. See the 27th canon of ethics.

3. The second section of the Bixby charge. If the acts alleged are true, and in violation of the Bankruptcy Act, it would call for severe punishment, more than could be imposed under this proceeding. And even if not actually illegal, the commission of such acts would be a violation of a lawyer's oath, and would subject him to appropriate disciplinary measures. We do not find that it would have violated any express provision of the Bankruptcy Act. Our examinations have been carried down to as late as January, 1930, at which time the Supreme Court of the United States adopted an amendment to General Orders in Bankruptcy, No. XXXIX. It forbids the solicitation of claims by a receiver or his attorney, for any purpose in connection with the administration in bankruptcy. Vol. VI, No. 6, American Bankruptcy Review, January, 1930, at page 1. Respondent was not receiver for Western Securities company, nor attorney for the receiver, and so is not included in this inhibition.

4. Bixby's statements do not bear strict analysis. Even if respondent's alleged purpose had been carried to the extent of procuring claims for involuntary bankruptcy purposes, it could not have been consummated, and we must assume the respondent knew the law. A valid delivery and assignment of three claims to respondent would merge them in one creditor, which would not

satisfy section 59b of the Bankruptcy Act, which requires three creditors in involuntary proceedings. It is true that respondent might have had them assigned to someone else, but this is speculating outside the record. And no matter to whom assigned, General Order in Bankruptcy No. V, as amended on April 13, 1925, requires that when claims rest on assignment, it shall be stated whether or not they were purchased for the purpose of instituting bankruptcy proceedings. We have no right to assume without plea of proof that respondent and two dummies, to be selected by him, or any of them, would perjure themselves in presenting a petition in the federal court. General Orders in Bankruptcy promulgated by the Supreme Court of the United States have the force and effect of law. *In re Seifred*, 4 Fed. (2d) 305. Our comments on the bankruptcy law are of course limited to our inquiries here. We appreciate that bankruptcy matters, in the large, are within the exclusive jurisdiction of the federal courts, but we may well look to them, and especially to our highest court, to enlighten ourselves as to whether an attorney, an officer of this court, has violated the laws of his country.

5. The mere procuring of names of creditors of a debtor in distress, for a sinister purpose, would be reprehensible, but the facts as to the supposed deal between respondent and Bixby seem to be clouded in doubt. Bixby's uncorroborated testimony, however honestly given, is unsatisfactory. He could not remember the names of the creditors of whom he spoke, apparently never saw them, and admits that he never had their addresses. The advertising facilities then being employed by respondent for procuring claims against Western Securities are irreconcilable with the belief that he would offer to pay $10 each for mere names of such creditors, when there were so many of them, and, as we have seen, such names could not well be used for the purpose alleged, even if Bixby had procured them. We think he must have misunderstood respondent. We must give respondent the bene-

fit of the doubt. We dismiss the second section of the Bixby charge.

6. Both in the petition in disbarment and elsewhere in the record, respondent's duty as attorney in the pulp company receivership matter seems to have been completely overshadowed by more or less irrelevant discussion of his supposed duty to Levy. The tenth canon of ethics reads: "The lawyer should not purchase any interest in the subject matter of the litigation which he is conducting." The evils that may result from doing so are here apparent. The bonds were not in dispute as far as appears of record, but if money was to be made or saved by discounting them through respondent, it belonged to the trust estate. Independently of printed precepts, a position as attorney for the receiver and as a private speculator in the receivership debts or securities is wholly inconsistent. Respondent claims that it was done openly and that the receiver knew about it. We do not need to decide whether he did or not, but if he did, what of it? They were both compensated from trust funds. If both fail, who will act as protector? Respondent was not Levy's attorney. Respondent's duty to Levy as a single creditor was secondary to his high obligations to the creditors as a whole. He was forgetful of this relationship of trust and confidence.

7. The Dunklee charge. If respondent wilfully made false statements, impugning the fairness of the judge, it was of course utterly contemptible. Judges are not wholly free to defend themselves. See the first canon, "The Duty of the Lawyer to the Courts." On the other hand, if the statements were true, and ground for serious complaint, the attorney should courageously make them. "An attorney who under such circumstances would fail to act, through fear of consequences either in the way of disfavor upon the part of the judge or punishment by fine and imprisonment, would and ought to be branded as a craven and a poltroon, and he would be quite un-

worthy of his high commission as a member of the bar."
*In re Cottingham,* 66 Colo. 335, 182 Pac. 2.

We did not hold in *People v. District Court,* 84 Colo.
367, 270 Pac. 663, that Judge Dunklee was not prejudiced,
but left the matter open to further determination. Judge
Dunklee filed an affidavit of his own on behalf of the
prosecution in the original case. He then sat on the bench
and passed favorably on his own affidavit in connection
with others, when he denied the motion for a change of
judges. Since there was no justification in statute or
precedent for this, no question of veracity should have
arisen based thereon, and for that reason the Dunklee
charge is now dismissed.

8. The Williams charge. We must pass over its
sordid details, but since this cause has imposed on us
the duty of categorical reference to rules, we may refer
to the 17th canon, as well as to the statute on misde-
meanors. Respondent was the aggressor in the physical
attack on Williams, and regardless of provocation, re-
spondent's language in court was scandalous, which re-
spondent freely admits. He apologized to the court, and
has sought to apologize to Williams, which has been re-
fused. Respondent and Williams were friends, ate lunch
together, and when acts are committed in the heat of
anger, it is always to be considered in mitigation.

Our action here taken is not based on any part of the
foregoing, wherein we have found that the charges have
not been sustained. In consideration of all of the others,
it is the judgment of the court that respondent be sus-
pended from further acting as an attorney and counselor
at law for the period of one year, and it is so ordered.
In this the justices all concur, except Mr. Justice Butler,
who believes that the suspension should be for a period
of six months.

Judgment of suspension for one year.