## No. 12,569.

Rossi *v.* Colorado Pulp and Paper Company et al.

(299 Pac. 19)

Decided January 13, 1931. Rehearing denied May 18, 1931.

462

464

Mr. CHARLES E. FRIEND, for plaintiff in error.

Messrs. BLOUNT, SILVERSTEIN & ROSNER, Mr. JOHN S. STIDGER, Mr. ERNEST MORRIS, Messrs. HUGHES & DORSEY, Messrs. VAN CISE & ROBINSON, for defendants in error.

*En Banc.*

MR. JUSTICE ADAMS delivered the opinion of the court.

THIS matter involves the winding up of the affairs of the Colorado Pulp and Paper Company, hereinafter called the company or pulp company, an insolvent domestic corporation in the hands of a receiver, who held under appointment of the district court of Adams county. Other questions incident thereto are also involved, all of which are considered in our opinion. After such appointment of the receiver, the district court temporarily lost jurisdiction by petitions in bankruptcy, but the jurisdiction of the state court was subsequently restored by the unconditional dismissal of the petitions in bankruptcy before the administration of the bankrupt's estate, and the state court, reinvested with jurisdiction, proceeded to its final determination. This matter has been brought to this court on writ of error by William Rossi, a general creditor of the corporation involved, to review various

orders and decrees of the district court in the premises. This is a companion case to causes No. 12,283, *Myers v. Beck, Receiver,* 88 Colo. 457, 299 Pac. 50, No. 12,450, *Myers v. Rude,* 88 Colo. 459, 299 Pac. 50, and No. 12,590, *Geo. N. Sparling Coal Company v. Colorado Pulp and Paper Company,* 88 Colo. 523, 299 Pac. 41. The four cases are being considered together. See also our former decisions in No. 12,063, *Buchhalter v. Myers,* 85 Colo. 419, 276 Pac. 972, and No. 12,067, *Rossi v. Beck, Receiver,* 83 Colo. 592, 267 Pac. 604. These six cases in this court all grew out of one suit in the district court involving the receivership. The cause in the district court is numbered and entitled, "No. 2367, Charles B. Myers, plaintiff v. Colorado Pulp and Paper Company et al., defendants." The four causes now before us might have been presented better under one writ of error, as more fully explained hereafter, but we have taken them just as they have come to us.

The defendants in error under the present writ of error (Rossi v. Pulp Company et al.) are as follows: the pulp company; George W. Beck, as receiver thereof; Charles B. Myers, holder of a large block of preferred stock in the pulp company; the International Trust Company, a corporation, as trustee under the bond issue of such company; I. Rude and Max Bronstine, purchasers of all property and assets of the pulp company at the last attempted sale thereof, and who claim to own all outstanding bonds with interest coupons of such company at the time last named. Also nine other defendants in error, as follows: Joseph Buchhalter, Moses Buchhalter, Morris H. Block, Morris Levy, Edward I. Levy, Harry Silverstein, Harry Davis, Aaron Bronstein and Stanley T. Wallbank. As nearly as we can glean from a cause without formal written pleadings and from different parts of the record, the last nine defendants in error named, are, or are said to have been at one time or another, holders of pulp company bonds in various amounts. Some of the defendants in error will be mentioned in other roles. If

this statement as to parties seems indefinite, it is so for the reasons given, but it will suffice for present purposes.

The facts, arranged chronologically as nearly as possible and necessary to an understanding of the disputes between the parties, are as follows: On June 2, 1925, the pulp company was incorporated with an authorized capital stock of $600,000, with shares of the par value of one dollar each, 250,000 of which are preferred, and 350,000 common stock. Simultaneously with the organization of the company, it is said to have executed a series of bonds, in the aggregate amount of $250,000, bearing interest at six per cent per annum, $90,000 of which were to mature at the rate of $10,000 per annum, beginning June 1, 1926, and continuing to June 1, 1934, the remaining $160,000 of which were to mature June 1, 1935, all secured by first deed of trust on all of the real estate of the company, situate in the counties of Adams and Gilpin, state of Colorado, "together with all buildings, structures, wells, fixtures, machinery, equipment and all other improvements now situate thereon or hereafter placed thereon." In other words, the mortgage or trust deed covered the pulp company real estate only.

On May 21, 1926, Charles B. Myers brought suit against the pulp company, Joseph Buchhalter et al., for an accounting, an injunction and the appointment of a receiver, in cause No. 2367, in the district court of Adams county. On May 16, 1927, the matter came on for hearing on application for the appointment of a receiver for the pulp company, and on that date the district court found and declared the company to be insolvent, and appointed George W. Beck to the office of receiver thereof, whereupon he gave bond in the sum of $50,000, took possession and control of all of its affairs, property and assets. Beck continued at all times in that capacity except for an ad interim interruption between July 21, 1927, and September 20, 1927, caused by bankruptcy proceedings, more fully referred to hereafter. Notwithstanding this interruption, he retained possession and control of the prop-

erty and assets at all times until on or about July 24, 1929. On June 9, 1929, the last attempted public sale of all such corporate property and assets was held, and on the following July 24th, the sale was confirmed. I. Rude and Max Bronstine bid in the property, used their bonds for the real estate and paid cash for certain personal assets, whereupon all such property was delivered to them. Further details of this transaction will appear later herein.

The suit to which we have last referred above (*Buchhalter v. Myers*), was primarily between Myers and Buchhalter. It proceeded to trial in the district court and judgment and decree in favor of plaintiff was rendered in accordance with the prayer of the complaint. Neither Myers nor Buchhalter nor any one else asked the lower court to vacate the order appointing a receiver, and the question was not presented to us. We reversed the trial court in *Buchhalter v. Myers, supra,* except as to the order appointing a receiver, which we allowed to stand for the reason that the question was not raised by assignment of error, and for the further reasons explained in our opinion in that case. The district court retained jurisdiction to effect a liquidation of the affairs of the pulp company and close the matter, which, after our decision in the Buchhalter case, finally culminated in a decree and order by the district court for the public sale of all corporate property and assets, to pay the debts and obligations of the company, of every kind and character. As stated, the sale took place and the decree of sale was confirmed. The plaintiff in error objects to such orders of the district court, as well as many other rulings.

The pleadings in the Buchhalter case, supra, are functus officio. There are no pleadings subsequent thereto, involving the matters now at bar, except as various petitions in the receivership matter may be denominated as pleadings. For practically all purposes, our present inquiry begins on May 16, 1927, the date of Beck's appointment as receiver, where the main narrative ends in *Buch-*

*halter v. Myers, supra,* but necessary references will be made to our opinion there.

The original order of the district court on May 16th, appointing Beck as receiver was limited until the final judgment and decree in accounting by Buchhalter in the suit brought by Myers against Buchhalter, et al., but the receivership did not end there. On May 21, 1927, the district court entered an order, supplementary to the appointment of Beck as receiver, in which order, inter alia, the court defined Beck's official powers and duties. Among the powers there defined, the receiver was to continue the operation of the mill, plant and business of the pulp company, "from time to time and in such manner and to such extent as may be for the best interests of said company and its creditors and stockholders"; also with authority to borrow money and to execute such receiver's certificates therefor as might be thereafter authorized by the court; also to take complete charge of all property and affairs of the company; and also to take and state the accounts of the several creditors of the company and of those indebted to it. All parties and persons were enjoined from bringing any suits or actions against the company or the receiver without the permission of the court and upon notice to the receiver. The order concludes with the words, "and said receiver is further vested, in addition to the powers aforesaid, with all general powers of receivers in similar cases, subject to the supervision of this court."

On June 4, 1927, the receiver filed a petition for instructions and on June 9, 1927, the district court, among other things, directed the issuance of two series of receiver's certificates, to be secured by liens on the property of the company. By the same order, the receiver was again directed to conduct the business as a going concern, with the added words, "in the usual business way."

June 16, 1927, the court directed the issuance of receiver's certificates, not to exceed the sum of $25,000 to

be a first lien on the corpus of the property consisting only of the real estate, buildings and machinery of the pulp company, superior to all liens and mortgages, excepting liens for taxes and expenses of administration. The court also directed the issuance of a second series of receiver's certificates, in an amount not to exceed $25,000, to be a lien on all of the property of the company, but subordinate to the first series, to existing mortgages, and to liens for taxes.

June 16, 1927, the district court appointed George W. Beck as general manager of the company at a salary of $500 per month, to begin in July, 1927, and to continue until the further orders of the court.

July 9, 1927, pursuant to a petition filed by Beck as receiver and Charles Ginsberg, his attorney, the court entered its order ''directing the receiver to pay himself on account of receiver's fees the sum of $1,000 chargeable to the preservation of the property, and $500 per month chargeable to the operation of the business of the receivership. The attorney for the receiver was granted and the receiver ordered to pay the sum of $2,000, $1,000 chargeable to the preservation of the property and $1,000 to the operation of the business of the receivership. The court reserving the authority to make further allowances.''

July 23, 1927, the pulp company officers filed a voluntary petition in bankruptcy in the United States court at Denver, and on or about that time, certain pulp company creditors filed an involuntary petition therein. We shall refer to the two petitions as one, which was their practical effect. On the day last named, the company was found and declared to be insolvent and adjudged a bankrupt; the matter was referred to one of the referees in bankruptcy, but little other proceedings were had in that court. The company was ordered to file schedules, which it apparently never did; the federal court did not assume physical possession of the pulp company prop-

erty or assets, and did not administer the bankrupt's estate.

July 26, 1927, attorney Clifford J. Gobble mailed from his office in Denver, a letter directed to the clerk of the district court of Adams county, containing orders signed by the district judge to be entered by the clerk. One of these orders allowed further compensations to the receiver in the sum of $2,000 to be applied on account for services as such from the date of appointment, "other than per month allowance for operating business." A photostatic copy of this order appears in the record in the Geo. N. Sparling Coal Company case, supra, for the reason that it is claimed that the date is or was July 26, 1927, but was improperly changed to make it seem as though made on July 20th, so as to antedate the first petition in bankruptcy filed on July 23, 1927.

Under date of July 26, 1927, the district court entered an order authorizing the receiver to defend the bankruptcy proceedings. This order was enclosed in the letter from attorney Gobble to the clerk of the district court with the other order above mentioned.

On or about August 4, 1927, I. Rude and Aaron Bronstein, claiming to own pulp company bonds in the aggregate par value of $158,000, filed a petition in intervention in bankruptcy, asking leave to join the petitioning creditors and others in sustaining the adjudication, and for an injunction, in effect, to prevent Beck as receiver, Myers and others, from encumbering the assets or paying out any moneys. Notice of hearing on this application was given, but as to whether it was ever heard, the record is silent. In this petition, Rude and Bronstein allege, among other things, that the pulp company estate is insolvent as has been adjudged by the district court; that property securing said bonds is wholly inadequate and insufficient, and that the petitioners will be compelled to resort to the general estate of said bankrupt for the deficiency that will accrue.

August 13, 1927, certain general creditors filed an an-

swer to the petition in bankruptcy, denying that the company had committed any act of bankruptcy, and praying that the petition be dismissed. They alleged that Joseph Buchhalter and his associates were the moving spirits and instigators of the bankruptcy proceedings to escape the jurisdiction and decree of the district court in a matter then and there pending and undetermined. (This apparently refers to the suit reported in *Buchhalter v. Myers, supra.*) On or about the same day (August 13th), five general creditors who had joined in the petition for an adjudication in bankruptcy, asked leave to withdraw, and that the matter be dismissed, on the ground that they had been induced to sign the petition under a misapprehension of facts and were misled into becoming petitioning creditors.

On August 23, 1927, while the cause was pending in the United States Court, sitting in bankruptcy at Denver, Beck and others undertook to enter into a stipulation to have the bankruptcy proceedings dismissed, and to have the pulp company estate administered in the state court in accordance with detailed plans outlined in the instrument. There is no dispute between the parties thereto, as to the validity of such stipulation. In fact, the bondholders demanded its enforcement and were successful in making it stand to the end, even to the extent of having portions of it incorporated in the decree of sale of assets. It was used largely as a basis of the receivership administration, as if all parties concerned had consented to it or had acquiesced in its terms. This has aroused bitter resentment on the part of general creditors, who deny the assertion of counsel for the bondholders that general creditors consented or acquiesced. None of the general creditors, of whom there are approximately 140, with unpaid claims then aggregating about $50,000, was a party to the stipulation. These claims were afterwards allowed and judgments rendered thereon in the receivership matter, but only the sum of about $10,000 of such claims has been paid. The main contest is now between the bond-

holders and general creditors, growing out of this stipulation. About fifteen of the unsecured creditors, holding some of the largest claims, have carried on the fight. The receiver himself is arrayed with the bondholders with respect to their common purpose to sustain this stipulation. For convenience only, we shall hereafter designate this instrument as the Myers-Rude agreement, or the bondholders' agreement. It reads as follows:

"It is hereby stipulated and agreed by and between the following parties to the above entitled cause, namely: Charles B. Myers, individually and as a stockholder in the Colorado Pulp and Paper Company, a corporation, and as plaintiff herein, and the Colorado Pulp and Paper Company, a corporation, International Trust Company, a corporation, I. Rude and Joseph Buchhalter, as bondholders, and also between Aaron Bronstein, as a bondholder, and George W. Beck, as Receiver of Colorado Pulp and Paper Company, each and all with each other, as follows:

"Whereas, in and by the decree herein entered on May 16, 1927, said George W. Beck was appointed receiver of all and singular the assets and property of defendant Colorado Pulp and Paper Company, and ever since such date has been and still is in charge thereof;

"And whereas, as shown by the complaint on file herein said Colorado Pulp and Paper Company had issued and outstanding Two Hundred Fifty Thousand Dollars ($250,000.00) of its bonds secured by Deed of Trust upon its property and assets, and maturing as in the complaint described, of which Ten Thousand Dollars ($10,000.00) thereof fell due and were paid on or about June 1, 1926, and Ten Thousand Dollars ($10,000.00) of which said bonds, as well as interest, have been in default since June 1, 1927.

"And whereas, the holders of said bonds or of a majority of them were of the opinion that on account of the appointment of a receiver in and by the terms of said decree, it would be for the best interests of the creditors

who were bondholders of said company, as well as other creditors, that the affairs of the said company be liquidated, and that the said liquidation take place in the bankruptcy court and under the acts of bankruptcy, and on that account have heretofore instituted or caused to be instituted in the United States District Court for the District of Colorado, bankruptcy proceedings by way of having the said company file a bankruptcy petition for adjudication of bankruptcy and also by having certain creditors, file an involuntary petition as against the said company.

"And whereas, there is a controversy between the stockholders of said company as to which persons constitute the Board of Directors and which persons constitute the officers of said company and as to who represents the said company, really, as attorneys, which controversy is reflected in said bankruptcy proceedings in motions to set aside the adjudication and by various other pleadings, and all of which are still pending.

"And whereas, there is a prospect that in the event of litigating all of the matters involved herein, such litigation will be long drawn out and expensive, which has induced the said Beck as receiver, to submit to the parties hereto a proposal whereby in the alternative, the bondholders shall on or before six months from the date herein, be paid the sum of $50,000 to be applied as payment for and in cancellation of $50,000 of the bonds last maturing, or in default thereof that in such event the entire property and assets of Colorado Pulp and Paper Company, be sold under order of the Court in said cause No. 2367 in the District Court of Adams county in order to pay off and liquidate all of the debts, bonds and obligations of Colorado Pulp and Paper Company, of every kind and nature, which proposition is satisfactory to said bondholders and on account thereof and solely induced thereby, that said bondholders should dismiss or cause to be dismissed, the said bankruptcy proceedings and which proposal and arrangement is satisfactory to the parties

476

above named, in accordance with the terms and conditions hereinafter set forth.

"Now therefore, It is agreed by and between each and all of the parties hereto, to and with each other, as follows:

"First: Said George W. Beck as receiver of Colorado Pulp and Paper Company shall immediately upon the signing of this agreement and its approval by the Court, pay to the International Trust Company of Denver, Colorado, as trustee for the bondholders of Colorado Pulp and Paper Company, the sum of $10,000 plus such additional amount as may be necessary to pay the accrued interest to date of payment, in order to pay, discharge and cancel the $10,000 of bonds now past due together with accrued interest thereon, and to pay the.......... interest on all of said outstanding bonds; which were due on June 1, 1927, which money shall be paid out of funds in the hands of said receiver and which money shall be used by said trustee to pay said bonds and interest, as aforesaid.

"Second: There shall be entered simultaneously with signing and approval of this stipulation and agreement in said cause No. 2367 in the District Court of Adams county, Colorado, an order and decree which shall provide that all and singular, the assets and property of said Colorado Pulp and Paper Company, in the hands of such receiver, shall be sold at public auction, to highest and best bidder, free and clear of all liens and encumbrances, for cash, with provisions for accepting bonds or allowed claims in lieu of cash, and permitting bondholders and creditors to bid at such sale, in order to endeavor to pay all debts and obligations of every kind and character of said company and which sale shall take place six months from the date of the signing of this stipulation and agreement, in the following event, namely, upon the failure of the said Colorado Pulp and Paper Company to pay on or before a date which is six months from and after the date of the signing of this stipulation and

agreement, the sum of $50,000 in payment, discharge and cancellation of $50,000 of these bonds of Colorado Pulp and Paper Company which mature according to their terms, on June 1, 1935, which bonds shall be taken up and paid prorata among those holding such last maturing bonds; it being the understanding and gist of this agreement that the said Colorado Pulp and Paper Company shall either pay off, cancel and discharge $50,000 of said last maturing bonds on or before the date above mentioned or in the event of failure so to do that upon the expiration of said six months period, the property of the company shall be sold under order of the Court as aforesaid to satisfy and pay said bond issue. The decree providing for the sale of the property shall be prepared as soon as possible so that in the event of default on the part of the company to make said payment of $50,000 within the time above specified, such decree of sale shall be placed immediately in effect so as to permit sale under proper advertisement at the earliest possible moment, after the date of such default and such supplemental decree of sale to be the form and upon the terms usually made in such cases, except as otherwise herein provided.

"Third: Upon the payment of the said $10,000 of bonds now in default, plus the accrued interest thereon and the interest to June 1, 1927, on the other outstanding bonds and the execution of this stipulation, and agreement, the decree hereinabove provided for to be entered simultaneously herewith, the said bondholders above mentioned, I. Rude, Aaron Bronstein and Joseph Buchhalter shall cause all of the proceedings in bankruptcy above mentioned, either voluntary or involuntary now before the Federal Court to be fully dismissed as soon as may be by compliance with the statutes and procedure in such case, made and provided, without either or any party therein recovering costs or expenses from any other party herein.

"Fourth: It is further agreed between all the parties hereto that the status quo concerning the controversy as

to who constitutes the Board of Directors for the Company and who is the attorney for the company, be maintained while the terms and conditions of this stipulation and agreement are being carried out. and in the meantime no stockholders' meetings be had and no action taken which would in any way jeopardize the contentions of either party in relation to such controversies thereto and which status quo shall be maintained, pending either the payment of said $50,000 above mentioned, or the sale of the property in the event of failure so to do.

"Fifth: It is further agreed that the two notes given by Colorado Pulp and Paper Company representing the attorneys' fees, given to the firm of Davis & Wallbank and to the firm of Dana, Blount & Silverstein be and they are recognized as obligations of the company and allowed as claims against the company by the receiver, although said claims represented by said notes were not filed within the time specified in the notice given by the receiver within which to present claims, the balance of unpaid principal on said note of Davis & Wallbank being the sum of $2,000 and the balance of unpaid principal on the note belonging to Dana, Blount & Silverstein being the sum of $1,000.

"Fifth (a): It is further agreed that no more receiver's certificates shall be issued or sold to be a lien ahead of the bonds in excess of the amount of $5,000 in addition to the $5,000 of receiver's certificates of this class already issued and which additional or second amount of $5,000 of prior lien certificates shall be expressly in terms and in fact limited for the purpose and applied only for the purpose of the payment of taxes, insurance and absolutely necessary preservation and only so much of said additional amount should be issued or sold as shall be absolutely necessary for such purposes, so that the ultimate amount of receiver's certificates as a lien ahead of the bonds, shall be limited to $10,000.

"Sixth: In the event of sale as provided for herein, it shall be provided in the decree of sale that the receiver-

ship fees and expenses and fees for the attorney for the receiver shall all be subordinate to the bonds and interest thereon except $10,000 for both of them, which amount shall be inclusive of any amounts already paid to either receiver or his counsel; provided that in the event of sale said compensation and expenses shall be first paid out of current assets in the hands of the receiver if there be any.

"Seventh: In order to obviate all possibility of any controversy between the parties, it is expressly recited and understood and agreed that the title to the bonds in the present holders thereof as of this date, is fully recognized and acquiesced in, provided that nothing herein shall be construed to relieve the defendant Joseph Buchhalter from accounting for profits or benefits from bonds as provided in the order of reference for accounting dated June 22, 1927.

"Eighth: It is further expressly understood and agreed that this stipulation and agreement shall and does in no way interfere with or jeopardize the right of the defendant, Joseph Buchhalter to take up, for review any and all matters involved in said suit No. 2367 in the District Court of Adams County, Colorado, excepting only the question of appointment of the receiver and any other matters which are expressly agreed to and covered by this stipulation and agreement.

"Ninth: It is further expressly understood and agreed that by consenting to this compromise stipulation and agreement, the bondholders and parties hereto, do not assume the attitude of having originally consented to the appointment of a receiver or to the operation of the property by such receiver; in the event the plant and property of the company is operated by the receiver, it is expressly understood that the same is not being done for the benefit of the bondholders or at their request, but for the benefit of or at the request of other parties in interest, and that the bondholders do not object thereto upon the sole condition and understanding that any op-

erating expenses or indebtedness of the receiver incurred thereby, are not and cannot and shall not be any lien on said property ahead of or paramount to the bonds.

"Tenth: It is expressly and specifically understood and agreed that time is of the absolute essence of this stipulation, compromise and agreement and that the time hereinabove limited to six months from the date hereof in which to pay, take up and cancel said $50,000 in bonds, as hereinabove set forth, shall under no circumstances be extended except by the written consent of the bondholders, for the reason among others specific, that said bondholders by this agreement, are waiving and foregoing their right and privilege to have the assets of said company administered in the bankruptcy courts and the sale take place thereunder.

"In witness whereof, the parties hereto have hereunto caused this instrument to be signed by each of them and by their officers, duly authorized thereto, on the 23rd day of August, A. D. 1927."

The above stipulation is signed by Myers, and by Beck, (purported) receiver of Colorado Pulp and Paper Company; also by said company through Myers as president, Jacob P. Karsh as vice president, Henry A. Bronstein and Roy S. Dexter as secretaries thereof; Aaron Bronstein, J. Buchhalter, and I. Rude by J. Buchhalter. (The reason we use the word "purported" before the word "receiver" above, is because Beck was theretofore appointed by the state court, but bankruptcy had intervened, as above stated.) Following the above signatures, the stipulation is further subscribed as follows:

"The International Trust Company considers that it has no authority to either consent to this stipulation or to dissent therefrom, and has no interest therein and therefor makes no objection thereto.

The International Trust Co.

By W. M. Bond Vice Prest.

"The above and foregoing stipulation and agreement is hereby consented to and approved by the Court this 23rd day of August, A. D. 1927.

By the Court:

S. W. Johnson,

Judge."

The stipulation also purports to contain the signatures of various attorneys representing or assuming to represent the parties to the agreement.

August 23, 1927, on the same day that the Myers-Rude stipulation was made, the district court entered a preliminary decree based thereon, reciting and making reference to said stipulation, and directing that in the event the pulp company, or some one on its behalf, on or before February 23, 1928, fails to pay to International Trust Company of Denver, the sum of $50,000 to be applied as provided in paragraph second of said stipulation, then all and singular the property and assets of the pulp company shall be sold under order and decree of court pursuant to the terms of said stipulation, in order to endeavor to pay and discharge the bonds and all debts and obligations of said company; and further providing that a further decree embodying the terms and conditions of sale be made and entered in the case and that such decree be prepared so as to be effectual as of the date above specified for payment of said moneys to said trust company and reserving jurisdiction therefor pending the happening of the default mentioned.

August 30, 1927, a stipulation for dismissal of the bankruptcy petition was filed in the federal court. It was signed by attorneys for petitioning creditors (Rude and Bronstein); by an attorney claiming to represent the pulp company; by various attorneys representing certain general creditors and by the attorney for Beck, "receiver" of the pulp company. The stipulation recites that:

"Whereas, a certain stipulation has been entered into between certain of the parties hereto, which said stipu-

482

lation is filed in the District Court of Adams County, Cause No. 2367 and which has been approved by said court; and

"Whereas, the parties *thereto* [our italics] have agreed to the administration of the property of the within alleged bankrupt by said court in accordance with the terms of said stipulation, reference to which is hereby made; and

"Whereas, said stipulation provided for the dismissal of the within cause;

"Now therefore, it is hereby stipulated and agreed by and between [attorneys for the parties named], that the involuntary petition in bankruptcy filed herein be dismissed at the costs expended by each of the parties hereto and that the within entitled cause be dismissed."

The evidence shows that the reason for the above word "thereto" in the stipulation was, that it was changed at the request of attorneys for certain general creditors; that the word was originally "hereto"; that it was changed to exclude the idea that such general creditors had agreed to administration of the receivership in the state court in accordance with the terms of the stipulation. On September 1, 1927, Beck was notified to this effect by the objecting attorneys.

On August 30, 1927, another stipulation for dismissal was filed purporting to be signed by the pulp company, its attorney, and attorney for Myers. This stipulation is similar to the other except that the words, "the parties hereto have agreed, etc.," are used instead of the word "thereto" as in the stipulation above mentioned.

September 2, 1927, attorney Ginsberg filed an affidavit in the bankruptcy court showing that on September 1, 1927, he mailed a notice to all pulp company creditors as follows:

"Denver, Colorado
August 26, 1927.

"In re: Bankruptcy Colorado Pulp and
Paper Company, Voluntary and Involuntary.

"You are hereby respectfully notified that petitions asking leave to dismiss and withdraw bankruptcy proceedings in the above cases, No. 5976 and No. 5977, have been filed in the District Court of the United States for the District of Colorado and will be granted on September 6, 1927, providing no objection thereto is filed.

"I have been able to induce the contesting parties and the bondholders to withdraw the above petitions in consideration of a stipulation and decree entered in the district court of Adams County in the receivership case No. 2367 and on file therein, wherein it is agreed that the amount in default on the bonds shall be paid immediately and in the event $50,000 is not paid to the bondholders on account of their indebtedness within six months from date, that the plant shall be sold at public auction free and clear of all encumbrances to pay debts.

"All of the parties and the larger creditors agreed that this was the most expeditious and inexpensive way of handling the matter.

"If you desire any further information concerning this settlement I will be glad to furnish same or you can procure the same from stipulation above referred to.

Very truly yours,

Geo. W. Beck, Receiver,

By Charles Ginsberg,

Attorney for Receiver."

September 8, 1927, Ginsberg mailed another notice to creditors as follows:

"Due to an error you were advised that the last date for filing objection to the dismissal and withdrawal of bankruptcy proceedings No. 5976 and No. 5977 would be September 6, 1927, the date should have been and is September 20, 1927. The order for dismissal will be entered upon said date providing no objection thereto is filed."

September 20, 1927, the matter of the dismissal came on for hearing in the bankruptcy court, whereupon that court entered the following order:

"This matter comes now to be heard upon the stipulation to dismiss the petition for adjudication here * * * and it appearing to the court that all creditors have had notice of this application and that no objections have been filed thereto:

"It is ordered by the court that the petition for adjudication herein be, and the same is hereby dismissed out of this court at the costs of the petitioner to be taxed."

No further proceedings were had in the bankruptcy court after the above final order of dismissal.

October 3, 1927, the receiver rendered his first report to the district court, from May 17, 1927, to August 2, 1927. Among items of operating expense are accrued interest on bonds, $3,080 and accrued taxes, $667.52. It is claimed that items of this nature are unlawful preferences to bondholders, attempted to be shielded by the Myers-Rude stipulation.

October 8, 1927, upon petition of the receiver, the court entered an order allowing Clifford J. Gobble the sum of $500 for services rendered to the receiver as special counsel.

On December 3, 1927, a general order adjudicating claims was entered, including that of Rossi and also the claims of plaintiffs in error in *Geo. N. Sparling Coal Co. v. Pulp Co.*, as well as many other claims. It further appears from this order that a previous order was entered on June 20, 1927, directing the filing of claims, and that (by the order of December 3, 1927) all claims of every kind and nature whatsoever not so filed by December 3rd, are forever barred from participating in the distribution of any assets of the defendant corporation. It is not contended by any one that there was a failure to give notice to present claims.

No judgments were recovered against the corporation prior to the time when the property was taken into cus-

todio legis on May 16, 1927, and no judgments against it have been recovered since then, except under the order adjudicating and allowing claims, and also except the deficiency judgment in the sum of $24,242, awarded I. Rude and Max Bronstine. No bondholders, as such, have filed any claim against the receivership estate, except as above, and except in the assertion of a lien by virtue of the trust deed on the pulp company real estate.

On December 31, 1927, the district court entered an order upon petition of the receiver for authority to sell the real estate and other tangible assets of the pulp company, and directed that the receiver notify the creditors that a hearing thereon would be held on January 16, 1928. The receiver's petition was not filed until the day of hearing.

On January 3, 1928, the receiver petitioned the court for an allowance to himself on account of his fees for $1,500 and for an allowance to Charles Ginsberg, his attorney, for a sum of $1,500, and on the same date, the order was entered pursuant to such petition.

January 12, 1928, the receiver filed his second report covering his acts from the date of his appointment, May 16, 1927, to December 31, 1927. It shows, inter alia, a reduction of $10,000 in the amount of outstanding bonds, an item of "Accrued Interest on Bonds, $8,743.92," and "Accrued Taxes, $1,944.01." Numerous other reports have been filed by Beck. We mention the first two only as illustrations, and in their bearing on the above mentioned preferences which it is claimed were unlawful.

January 16, 1928, George N. Sparling Coal Company and other unsecured creditors filed a petition in intervention in the district court, in which they asked, among other things, that they and other general creditors be paid in full before payment of the bonded indebtedness, and that the holders of bonds be required to restore amounts paid to them in case the net earnings of the receivership were insufficient to pay all claims in full. They further asked that the agreement and stipulation of

August 23rd and the order entered thereon be vacated. The petition was denied.

The petition to sell assets filed by the receiver on January 16, 1928, is very lengthy. It refers to the Myers-Rude agreement and shows that the receiver has been unable to raise the $50,000 as provided therein. It recites the outstanding bond issue; that claims have been allowed and judgments ordered to be entered amounting to the sum of $49,695.77, besides accrued interest in the sum of $3,033.30; that the receiver has not sufficient funds to pay them or any part thereof; that he can pay no dividends out of earnings before the date of sale as provided in the stipulation; that he has sold or issued the sum of $10,000 receiver's certificates of series No. 1, and $5,000 out of series No. 2, but can sell no more in view of the fact that the plant and property will be sold on February 23, 1928; that he is unable to operate successfully the plant and business of the company and make a profitable showing, but on the contrary, is of the opinion that the loss in the receivership equity may be increased without materially increasing the value of unsecured creditors' claims. Various other distressing financial circumstances are set forth in this petition, which is signed by Ginsberg as attorney for the receiver.

January 16, 1928, the court heard the receiver's petition to sell assets and entered a decree of sale. The court appointed Beck as special master in chancery to conduct the sale. The second paragraph of the findings and decree reads: ''That the petition of said receiver to sell the assets of the receivership estate is, and all and singular the allegations therein contained are, true, and that the operation or further operation of the properties or business of said defendant, Colorado Pulp and Paper Company by the said receiver is and would be continued at a loss and that it is impossible for the said receiver to operate same at a profit and that its further operation from an economic standpoint on the part of the said receiver would be futile and of detriment to the said

company, its bondholders and its creditors and to the said receivership estate and that it is for the best interest of said receivership estate of said corporation and its bondholders and creditors that the assets and properties of said defendant, Colorado Pulp and Paper Company to be sold as herein provided.''

The decree provided for sale without equity of redemption. The court fixed an upset price of $300,000, which was later removed.

The special master gave notice of sale to be held on February 29, 1928. Publication was made in the Brighton Blade, a weekly newspaper published at Brighton, Adams county, Colorado. There were no bidders and the sale was adjourned from time to time. Numerous other attempts were made, but none were successful until the final sale on June 10, 1929, confirmed July 24, 1929. Plaintiffs in error in the several causes make a point of insufficient advertisement, but the dates of publication are numerous, and we do not go into the question further because our decision is not based on failure to give notice of sale.

August 28, 1928, Joseph Buchhalter and I. Rude moved that the upset price of $300,000 be removed and on December 29, 1928, the motion was granted, to which Myers and general creditors objected. The only bids after the upset price was removed were one by Rude, on February 18, 1929, of $150,000, which was rejected, and the last one on June 6, 1929, by I. Rude and Max Bronstine, of $228,000 in bonds for the real estate and $5,692.67 for personal property. This bid was confirmed. A deficiency judgment in the sum of $24,242 was awarded in favor of the bondholders Rude and Max Bronstine. There were numerous objections by general creditors and some by Myers to these various orders.

Further, as to attorneys' fees. On June 14, 1928, the district court allowed attorney Charles Ginsberg a salary of $300 per month. February 21, 1929, the receiver notified the clerk of the district court that Ginsberg no longer

represented the receiver and that John S. Stidger had been substituted. Various other orders concerning payments of fees to attorneys were entered. The total allowance of fees to attorney Stidger was as follows: March 15, 1929, $500; May 9, 1929, $500; August 19, 1929, $500; December 27, 1929, $1,500; total, $3,000. He appeared frequently in the court below and several times in the cases in this court, but in this court, at least, always in defense of Beck personally. We find in one place that Stidger referred to the Myers-Rude agreement as void as contrary to public policy, but apparently for the reason that his principal Beck did not take this view of it, Stidger did not make an attack on it in this court. Beck and his attorneys left the general creditors to shift for themselves in this court, and even let counsel for the bondholders appear as attorneys for Beck in *Myers v. Beck,* where the rights of all creditors were jeopardized by such position, as will more fully appear hereinafter.

On July 2, 1929, the receiver filed a verified report of operations, and also of assets and liabilities as of March 31, 1929, showing, among other things, an equity in the receivership estate of $425,837.58; outstanding bonds, $223,000, and accrued interest on bonds, $18,240.

On July 2, 1929, consent to confirmation of sale was filed by the holders or purported holders of all of the outstanding bonds of the pulp company in the aggregate amount of $228,000, and on July 24, 1929, an order of the district court was filed, approving and confirming the sale to I. Rude and Max Bronstine. This report was afterwards modified in certain other details, not necessary to the present recital.

December 23, 1929, the court entered its final decree which shows an additional and final payment was made to the receiver in the sum of $2,000.

One of the briefs gives the following summary of fees and allowances to the receiver and his attorneys:

| | | |
|---|---|---|
| " George W. Beck as Receiver | | $ 5,500.00 |
| George W. Beck as General Manager | | 12,500.00 |
| George W. Beck, Receiver, additional allowance | | 2,000.00 |
| Total | | $20,000.00 |
| Receiver's Attorneys: | | |
| Charles Ginsberg | $7,200.00 | |
| Clifford J. Gobble | 500.00 | |
| John S. Stidger | 1,500.00 | |
| John S. Stidger | 1,500.00 | |
| Total | . | $10,700.00 |
| Grand Total | | $30,700.00 " |

In addition, a fee of $250 was paid to another attorney who appeared as special counsel in the oral argument before this court in *Buchhalter v. Myers, supra.*

The final decree contains the following clause, inter alia: "And it is further ordered that said receiver shall, after making said final distribution, file his proper receipts or vouchers therefor with the Clerk of the Court and the said receiver shall thereupon be forthwith discharged and his bond released."

The records contain many other interlocutory orders and decrees which we do not consider necessary to be set forth at this place.

A separate matter in which Rossi, plaintiff in error in the present case is concerned, but in which the other plaintiffs in error in the several cases here have little if any interest, relates to an alleged trespass caused by a pipe line on Rossi's land.

Like Rossi, plaintiff in error in the present writ, plaintiffs in error in the Geo. N. Sparling Coal Company case are also general creditors of the pulp company, so that our remarks as to one of that class will apply to all except where particularly differentiated. The Sparling writ of

error, being the last one sued out to review the one suit in the district court, marks the culmination of the complaints of general creditors in this court. The significance of various dates, shown chronologically above, is not to be underestimated and should be constantly kept in mind. Matters not fully determined here have been reserved for our opinion in the Sparling case.

■ 1. Rossi's first assignment of error reads, ''The court erred in appointing a receiver herein.'' In *Buchhalter v. Myers, supra,* we expressed our strong disapproval of the appointment of a receiver for the pulp company. This was in connection with the question of a money judgment and unconscionable costs, the outgrowth of the receivership, which costs were unlawfully taxed against Buchhalter. We reversed the judgment and directed the re-taxation of costs. We do not find it necessary to retract anything that we said in that case. In fact, subsequent developments portrayed in the present four records indicate that the evils consequent upon the appointment of the receiver were even more deplorable than we then realized. But Rossi and all other claimants have pursued their remedies in the receivership matter. They have had their several claims adjudicated and allowed therein. In this and in other respects, they repeatedly dealt with the receiver in his official capacity and asked or obtained court orders that involved recognition of his appointment by the district court. They thereby acquiesced in such appointment and cannot now complain of it on the ground of mere irregularities. *Groutt v. First National Bank,* 48 Colo. 557, 564, 111 Pac. 556; *Dickerson v. Cass County Bank,* 95 Ia. 392, 64 N. W. 395; *Hampden National Bank v. Hampden Railroad,* 246 Mass. 404, 141 N. E. 107.

■ ■ 2. As we said in another receivership case, *Pomeranz v. National Beet Harvester Co.,* 82 Colo. 482, 488, 261 Pac. 861, ''Even though * * * we decline to set aside the appointment, our refusal to do so must not

be taken as an indication that we have acquiesced in or recognized its propriety.'' Moreover, the office of receiver is in the nature of that of a trustee, and those who have lawful claims against the receivership estate are cestuis que trustent. This gives the latter the right to be heard.

3. Rossi's second assignment of error is, ''The court erred in continuing the receiver under the stipulation of August 23rd, 1927.'' It is true that we referred incidentally to the Myers-Rude stipulation in *Buchhalter v. Myers, supra,* where its validity was not under consideration and was not challenged by any assignment of error, but we further made it plain, on page 429 of that opinion, that ''Myers represented Myers, Buchhalter represented Buchhalter, and there were not and are not any other parties involved.'' The Myers-Rude stipulation was not the only contributing cause to the continuation of the receivership. It cannot be seriously questioned from the records before us that such stipulation and the contentions of the parties thereto were largely instrumental in prolonging the litigation beyond all necessity, but other acts, particularly those of the receiver himself, contributed to the delay in a speedy winding up of the affairs of the pulp company.

4. The fourth assignment of error reads, ''The stipulation of August 23rd, 1927, not only as to parties signing same but as to creditors and this plaintiff in error is void and the court erred in entering any orders or decrees in pursuance thereof.'' See our statement of facts, under date of August 23rd, 1927, showing who attempted to stipulate, and surrounding circumstances.

It is unnecessary to discuss all of the terms and provisions of the stipulation. It begins, ''It is hereby stipulated and agreed by and between the following parties,'' etc., and its limitation to the immediate parties is apparent throughout. Its manifest purpose is mainly to protect Myers and certain bondholders and to accord them

various privileges to which they would not be entitled in the absence of contract, and inferentially, to deprive absent general creditors of rights to which they are entitled in the administration of an insolvent corporation in custodio legis. One of the provisions against the rights of general creditors is contained in the first clause, that Beck, as receiver, shall immediately pay the sum of $10,000 as principal on bonds that accrued on June 1, 1927, after the receivership had commenced, also accrued interest thereon, and also accrued interest on all outstanding bonds, the total of which outstanding bonds at the time of such commencement of the receivership is said to have been $240,000. It is to be remembered that the bonds were secured by real estate only. In addition, the mortgage did not cover rents, issues and profits, but the payments mentioned were made out of general assets. We have in mind the recognition of valid, subsisting liens, created and of record prior to the commencement of the receivership, in accordance with our opinion in *International Trust Co. v. United Coal Co.*, 27 Colo. 246, 60 Pac. 621, but the effect of that case is not to be extended beyond the matters there decided. After the receivership commenced, the rights of claimants are to be determined in accordance with their relative priorities. The security of the bondholders is not to be augmented beyond its actuality, as set forth in the mortgage or deed of trust. The estate being insolvent, and a deficit apparent, prior lien holders are not to be enriched at the expense of general creditors. It is as unlawful to do this as it would be for general creditors to take the rightful share of prior lien holders. General creditors have not made any such attempt, but before they had a chance to prove their claims, the receiver made this agreement to pay bondholders out of general assets, the only source of payment of claims of general creditors. Pursuant thereto, the receiver so paid the sum of $10,000 as principal and not less than $8,743.92 interest on bonds. See statement of facts, under dates October 3, 1927, and January 12,

1928. These payments were unlawful preferences. We direct that the status quo be restored and to that end that the bondholders and receiver be ordered to pay such sums back to the general fund with legal interest thereon. The lien of the bonds and interest coupons represented by such payments shall be reinstated on the real estate, but such lien shall be subrogated to such general fund in like amounts, as security for the faithful performance of such order. This is not to be taken as a limitation on amounts of preferences to be refunded. Questions concerning other alleged preferences, such as payment of taxes and other amounts paid to various parties, are discussed in our opinion in Geo. N. Sparling Coal Co. v. Pulp Company.

We here note the fact that the $50,000 mentioned in the Myers-Rude agreement was not paid. This clause is important now only to the extent of showing the protraction of the receivership under the Myers-Rude stipulation, and its effect, if any, on additional costs and expenses occasioned thereby.

5. As to the effect of the bankruptcy proceedings. "The bankruptcy law is paramount, and the jurisdiction of the federal courts in bankruptcy, when properly invoked, in the administration of the affairs of insolvent persons and corporations, is essentially exclusive." 3 R. C. L., p. 165, §2; *In Re Watts,* 190 U. S. 1, 23 Sup. Ct. 718, 47 L. Ed. 933; Tardy's Smith on Receivers (2d Ed.), Vol. 2, §710, p. 1922; *In re Quemahoning Creek Coal Co.,* 15 Fed. (2d) 58; *In re Sage,* 224 Fed. 525.

" 'The filing of the petition is a caveat to all the world and in fact an attachment and injunction.' " *May v. Henderson,* 268 U. S. 111, 117, 45 Sup. Ct. 456, 69 L. Ed. 870 (citing many cases). In the above case a "creditors agreement" was involved, and was disapproved in strong language by our highest court on page 119 of the opinion, for the reason that such agreement was collusive, and a fraudulent effort to divert the funds of the bankrupt to a favored creditor.

494

We believe that counsel for the bondholders will not dispute the above proposition with respect to the effect of bankruptcy. · We say this with confidence because in their brief filed in the Geo. N. Sparling Coal Company case, they cite many authorities that support our conclusions, taken from reports of the United States Supreme Court, other federal courts, and state courts. The opinion of our highest court in *May v. Henderson, supra,* is among those cited by the bondholders. The application made by counsel was on the question of the right of the district court to award Beck an additional sum of $2,000 after bankruptcy had intervened, but it is equally pertinent with reference to the attempted disposition of funds under the Myers-Rude stipulation, which was also made at a time when the corpus of the estate was under the jurisdiction of the bankruptcy court.

6. From the above it is apparent that when the jurisdiction of the state court was ousted by the petition in bankruptcy, it ipso facto deposed Beck as receiver, and deprived him of any further duties, except to preserve the bankrupt's property, and to hold it subject to the orders of the federal court. This does not mean that the bankruptcy court would or could sanction or direct the administration of the receivership in the state court under the Myers-Rude agreement, or direct its disposition in any particular manner. It means that the bankruptcy court would either maintain its exclusive jurisdiction, or restore exclusive jurisdiction to the state court, for administration under state laws. It could not do more, and nothing further was attempted. Concurrent conflicting court orders in a proceeding in rem are manifestly impossible in the administration of justice.

7. Even if the state court had been in control on August 23, 1927, the attempted stipulation was void as against general creditors. Perhaps the most serious abuse of supposed power was on the part of Beck, purported receiver, in assuming to make an agreement in favor of one class of cestuis que trustent, against another

class, at the expense of the latter in the attempted determination of preferences, contrary to law. Another, it may be minor in its consequences, was to accept the supposed signature of the pulp company, when its hands were twice tied, first by the state receivership, and afterwards by bankruptcy. Furthermore, the general creditors not being parties, it is elementary in the law of contracts that they were not bound, and the attempted consent and approval of the district court without notice to them was void. It was an unlawful agreement, as to which, courts of equity do not concern themselves as between the parties thereto. *Buchhalter v. Myers, supra,* at pages 435, 436.

Concerning the International Trust Company, trustee under the bond issue: It was named as a party to the Myers-Rude agreement, but it will be seen therefrom that it did not assent thereto. It appeared by counsel in the lower court and made objections to proceedings there. When we speak of parties to the Myers-Rude agreement, it is therefore to be understood as excluding such company.

8. It should be said in explanation that when the stipulation was attempted, it is claimed that some of the participants thought there would be enough money to satisfy all just claims, but three months before, on May 16th, the court found and determined that the pulp company was insolvent. And Rude and Aaron Bronstein could not have believed it to be solvent, for only about three weeks before, they had made oath to the contrary in the United States court (see above statement made by them on August 4, 1927). Be this as it may, it did not justify the attempted stipulation, and when it later became apparent that the corporate assets were insufficient, the bondholders were more insistent than ever that their partisan stipulation be enforced, which of course created additional grievances on the part of the general creditors.

9. Counsel for the bondholders have attempted

to evolve a theory of estoppel against the general creditors, to make up for their lack of participation in the Myers-Rude stipulation. Counsel for the bondholders argue that the general creditors are bound thereby, to the same extent as if they had been parties, because the latter failed to object in the bankruptcy court on September 20, 1927, to the terms and conditions in the bondholders' stipulation of August 23rd. Counsel for the latter quote this from our opinion in *Southern Surety Co. v. Peterson,* 86 Colo. 350, 354, 281 Pac. 746; ''It may be said that he who remains silent when duty requires him to speak will not be heard when justice requires him to be silent.'' See also *Bank of U. S. v. Lee,* 13 Peters 107, 119, 10 L. Ed. 81; *Morgan v. Chicago & Alton R. R. Co.,* 96 U. S. 716, 24 L. Ed. 743. It remains to be determined whether this noble aphorism is applicable to present facts. The position of the bondholders is that they lost a valuable right by waiving administration in bankruptcy. It seems also to be in effect that the general creditors were compelled, among other things, to subscribe to the receiver's promise to pay the bondholders unlawful preferences, which it later developed amounted to not less than $18,743.92, or, on failure of all general creditors to comply with such demand, they were compelled to go ahead with bankruptcy. To put it in the words of counsel for the bondholders themselves, we quote from page 28 of the brief on behalf of Max Bronstine, I. Rude and Joseph Buchhalter, filed by them on September 19, 1930, in *Geo. N. Sparling Coal Co. v. Pulp Company, supra,* they say, in remarks emphasized with their own italics:

''*If the creditors objected to any of the terms and conditions of the agreement under which the bankruptcy proceedings were to be dismissed, they were bound to speak—bound to file their written objections in the bankruptcy court.*

''The creditors had until September 20th, 1927, to file

these objections, and were also notified in writing of such fact."

We think it will be seen from the following that the theory of the acquiescence of the general creditors was wholly an afterthought. We should refrain from devoting so much time to a proposition that has no foundation in law or fact, but as the Myers-Rude agreement impregnates the entire proceeding, and affects the validity of the attempted sale to I. Rude and Max Bronstine, free and clear of all liens and encumbrances, we are reluctantly compelled to point out some of the frailties of the theory of estoppel. We give fourteen reasons why counsel's arguments thereon do not appeal to us. They are as follows:

(a) The burden of proof is on the bondholders to show that they were misled to their injury, by the silence of the general creditors, but this was neither pleaded nor proven, nor shown by any fact or circumstance. Statements contained in the Myers-Rude agreement, on which the bondholders rely, were not made in the presence of general creditors, hence do not bind the latter.

(b) It appears affirmatively from a comparison of events on certain dates, that if the bondholders were misled, they deceived themselves.

(c) As early as August 13, 1927, general creditors inaugurated the movement to dismiss in bankruptcy, and there was no reason why they should object to their own petition to dismiss. They wanted it granted, and obtained their wish.

(d) The Myers-Rude stipulation of August 23, 1927, is void on its face, and the attempted order of the district court under that date is also void for the reasons heretofore stated.

(e) If that attempted order of the state court had been good, it would not have needed the approval of the bankruptcy court to make it better.

(f) The notice mailed on September 1, 1927,

498

by Ginsberg for Beck, to approximately one hundred and forty unsecured creditors of course could not reach them on August 23, 1927, or in time to give them a chance to head off the void order obtained by Beck and others from a court of incompetent jurisdiction.

(g) No matter whether the general creditors were thereafter notified or not, they were not bound by an order of that kind.

(h) If the general creditors were required to speak on September 20th, or forever keep silent, they could not, in any event, raise their voices at that time loud enough for the bondholders to hear them in the previous month of August, when the bondholders were most active. Certainly counsel for the latter do not put it this bluntly, but the record as well as the daily calendar, support our conclusions. The month of August, 1927, was when all parties to the Myers-Rude agreement irretrievably committed themselves to a fixed determination to procure administration of the pulp company estate in the state court. See under dates of August 23rd and 30th, in our statement of facts. The fact that some of the parties thought to dictate the court procedure is another question.

(i) The only "issue" in the bankruptcy court on September 20, 1927, was on a question of dismissal. That was the matter heard, and that was the matter determined. Under the circumstances here, the *bondholders* are estopped by that record to say that the final judgment of unconditional dismissal means anything different from what it says.

(j) One of the grounds alleged for dismissal is contained in the answer and also in a petition to dismiss, filed on August 13th, by certain petitioning creditors. Some of these creditors charged Buchhalter and his associates with misrepresentation in inducing them to sign a petition for adjudication in bankruptcy; we find no denial of these charges. Such charges were before the bankruptcy court on September 20, 1927, when it made

its unconditional order of dismissal. It is as reasonable to suppose that these serious charges against bondholders induced the order of dismissal, as much, if not more, than the Myers-Rude agreement. As far as disclosed, the latter instrument was never presented to the bankruptcy court, but is mentioned there only by general reference.

(k) As to the bondholders' waiver, it may be said that they "waived," or attempted to "waive," the undetermined charge of fraud against themselves, fully as much as their supposed right to an adjudication in bankruptcy. The bondholders could not use their void district court order for any purpose.

(l) In view of such charges then pending and undetermined, the bondholders' right to administration in bankruptcy was not absolute. If the charges were true, the bankruptcy court would not necessarily require the bondholders' consent to a dismissal. But with it all, the fact of the dismissal is all that concerns us.

(m) The bankruptcy court, upon unconditionally surrendering its jurisdiction, could not furnish directions to the parties or to the state court as to methods of procedure in the latter court, through or by means of the Myers-Rude stipulation or otherwise, and the bankruptcy court did not attempt such a thing.

(n) Dismissal of the petition in bankruptcy was regarded by the bondholders and others as an accepted fact, subject only to the consent thereto of all concerned. The second paragraph of the Myers-Rude stipulation called for an immediate preliminary order of sale by the district court. The determination to get a dismissal in bankruptcy was common to all, and having been obtained, ends further inquiry on this subject as far as we are concerned.

There is nothing whatever to say in favor of the Myers-Rude stipulation. It must be ignored as a basis of the receivership administration.

10. It is more than a mere saying in equity

that fraud taints everything it touches. It actually does it. The illegal stipulation of August 23, 1927, has acted as a parasite to aid in sapping the life blood of the receivership general assets almost from the start. It has done more than this, and presents a question that goes to the foundation of the whole matter. It has robbed the general creditors of representation in the person of a receiver who should have been unbiased, and impartial in his attitude toward all persons and corporations in any wise interested in the receivership assets, real or personal. It made Beck a partisan advocate of the bondholders. This was his role in and out of three courts: First, in somebody's law office on August 23rd; next in the district court of Adams county on the same day; next in the United States court sitting in bankruptcy; then back to the district court; next in the Supreme Court of this state in cause No. 12283, *Myers v. Beck, supra,* when he (Beck) let counsel for the bondholders appear for him in his official capacity against the rights of all other creditors as well as the claims of Myers; then in No. 12450, *Myers v. Rude, supra,* in another hidden attack on the rights of general creditors, where his attorney, Stidger, acknowledged service of the writ of sci. fa., but did nothing except to move for the dismissal of the writ of error; then in No. 12569, *Rossi v. Pulp Company, supra,* when the question of the validity of the bondholders' stipulation was presented to us for the first time, and Beck appeared by his attorney Stidger, but did nothing except to attempt to defend himself personally; and finally in No. 12590, *Geo. N. Sparling Coal Co. v. Pulp Co., supra,* under issues similar to those in the Rossi case, Beck, through his attorney last named, pursued the same tactics that he employed in the Rossi matter. A frequent citation found in adjudicated cases is that the presumption is that a public officer does his duty, but this is a rebuttable presumption, and under the records before us, the proof is conclusive that Beck was not faithful to his trust. He was partial first to himself on account of

his emoluments, and then to others, especially the bond-holders before general creditors.

11. As we have said above, Beck's office of receiver was in the nature of that of a trustee. There is an ancient maxim that equity will not suffer a trust to lapse for want of a trustee. Certainly no one can deny that a pseudo trustee, particularly when a court officer, is worse than no trustee at all. These records demonstrate the truth of such proposition. And we cannot consistently exonerate the district court from blame for its repeated approval of Beck's conduct in the face of protests by interested parties.

12. Beck, as receiver, is a defendant in error in the four causes now before this court, growing out of the one receivership matter in the district court, but has never lifted his voice here in defense of the rights of the general creditors. The point of law that this suggests is that there can be no application in this case of the general rule that creditors of an insolvent corporation in custodio legis, are represented in court in the person of the receiver. Since such representation in the present matters is not actual, but only nominal, injured parties must of necessity prosecute their own writs of error, and otherwise defend their rights.

13. If we have correctly appraised the dissection of Beck's character by counsel for the bondholders, it is as follows: As receiver, he was right in his participation in the Myers-Rude stipulation, and in attempting to enforce it. As receiver, he committed a breach of trust in his procurement of exorbitant fees. As general manager, he was likewise guilty. And as special master in chancery, in the attempted sale of all pulp company assets to the holders of all outstanding bonds, counsel for defendants in error believe that Beck's actions should be confirmed and approved. This computation would seem to make Beck about one-half bad and the other half good. We must reject such fractions. ''Falsus in uno, falsus in omnibus.'' No matter whether we look upon Beck un-

der one or all of his three designated titles, this maxim applies. It goes to the heart of the attempted sale of all remaining corporate property and assets to I. Rude and Max Bronstine and destroys its integrity. Beck cannot appear in court in the role of Dr. Jekyll and Mr. Hyde. This principle was applied in *Pueblo Realty Co. v. Tate,* 32 Colo. 67, 69, 75 Pac. 402, where different corporations were controlled by the same officers, and for that reason we held that they could not be heard to complain. At page 429 of our opinion in the Buchhalter case, supra, we applied the same principle to Myers, as a pre-corporation promoter and post-corporation stockholder.

14. Beck met with an ignominious fate at the hands of the bondholders. After he had served their purposes under the Myers-Rude stipulation, which was incorporated in the decree of sale, and after he had loaned them his official name and title to accomplish their ends in *Myers v. Beck, supra,* they cast him off. In the last case brought to this court, *Geo. N. Sparling Coal Co. v. Pulp Co., supra,* counsel for the bondholders turn and rend Beck in their brief and cross assignments of error, because he tried to do the same thing for himself on a smaller scale, that he attempted to do for them, i. e., obtain a void order from the district court while the matter was pending in bankruptcy. His offense, according to counsel, was in attempting to get $2,000 additional fees at that time. His virtue, according to the same counsel, was his participation in the stipulation of August 23, 1927, which sought to involve the whole pulp company estate. This tells its own story.

15. On April 1, 1929, our decision in *Buchhalter v. Myers, supra,* was announced. On June 6, 1929, the sale of all assets was attempted. On December 10, 1929, the court made certain "findings of fact as a basis for the preparation of final decree." They well illustrate its fallacy. These findings are set forth at folio 1355, et seq., of the record in the Sparling Coal Company case, supra. We quote the following therefrom:

"The court: We accept the statement that this stipulation is the controlling factor in this case in determining most of the questions. As I said before on numerous occasions, and I repeat it again, that creditors were not parties to that stipulation. The stipulation didn't state that it was between these parties; they didn't take any part in it, and they didn't do anything afterwards that would estop them in any way from questioning that stipulation. So, so far as the stipulation is concerned, it has no binding effect upon the general creditors. But as to the rest of the parties, the ones who signed that, it certainly determines their rights in this case. I don't think that we have ever said anything different from the very beginning, although it seems rather inconsistent that the Supreme Court should have said that this stipulation was the guide post and the binding contract upon us, to be lived up to by all, and yet commented upon some of the fees allowed to the receiver and attorney that were included in that stipulation, agreed to be allowed. Those fees were all settled and were never in dispute. The stipulation itself agreed that those fees were allowable as a part of the $10,000. Why the Supreme Court should mention those items is something I don't know; perhaps anybody can guess the reason for it as well as I can. It doesn't matter in this case, however, but it was not necessary in the decision of the case."

The above remarks of the district court present one of the unexplained ironies in the several records before us. We again have recourse to comparative dates: August 23, 1927, district court's attempted approval of the Myers-Rude stipulation. After that, some time prior to December 31, 1927 (see Beck's report under January 12, 1928), $18,743.92 was paid by receiver to bondholders under above stipulation. And on January 16, 1928, the district court denied the application by general creditors to set aside the stipulation. In the light of these facts, no matter what we said on April 1, 1929, in our opinion in the Buchhalter case, we cannot see how our remarks at

that time exercised such a baneful influence over the mind of the district court in the years 1927 and 1928. Concerning justice as there administered, in the language of Lord Selden, "Equity is a roguish thing." It is also lamentable that since the district court knew that the general creditors did not consent to the stipulation, and that they were not estopped, that that court adopted the theory of estoppel in the decree and made reference to the failure of the general creditors to object to the dismissal in bankruptcy, i. e., their own request and that of others *for* a dismissal.

16. There are other features of the above quoted comments of the district judge that we cannot ignore. We did not say in *Buchhalter v. Myers,* or elsewhere, that "this stipulation is the controlling factor," or that "this stipulation was the guide post and binding contract upon us, to be lived up to by all." These interpolations in our opinion in the Buchhalter case were injected by the district court. If our opinion was not understood by that court, we shall endeavor to make it plainer. Our purpose was to discourage the practice of the district judge of throwing business concerns into the hands of a receiver, and appointing Beck to that office. It appears that our warning in the opinion by Mr. Justice Campbell in *Pomeranz v. National Beet Harvester Co.,* 82 Colo. 482, 261 Pac. 861, fell on stony ground. The same district court there appointed the same Beck as receiver. Our decision in the Pomeranz case was announced on November 14, 1927, and most of the receivership expenses in the present case were incurred after that time. The district court even permitted them to continue after January 16, 1928, when the receiver reported in writing to the district court that he was unable to operate successfully the plant and business of the company, but that the loss in the receivership equity might be increased without materially increasing the value of unsecured creditors' claims. It was a good place to stop, but Beck's salary went on.

As pointed out by Mr. Justice Campbell on page 487 of the opinion in the Pomeranz case, it appears that, based on a claim of sixteen dollars, and on a return false and improper on its face, the district court appointed Beck as receiver for a corporation that possessed assets aggregating the sum of $82,000, and property subject to levy in Adams county of about $17,000. The warning of this court in the Pomeranz case was treated as contemptuously as the district court later accorded our opinion in the Buchhalter case.

17. We must here refer to another large receivership in embryo, launched in the district court of Adams county, in which it filed its written opinion and findings on November 17, 1927, and ordered the appointment of a receiver, only three days after our decision in the Pomeranz case. We have reference to *Mountain States Packing Co. v. Curtis,* 86 Colo. 355, 281 Pac. 737, opinion by Mr. Justice Burke. In that case, the district court, after keeping the defendants in court during the period for pleadings, and thereafter during a trial lasting fifteen days, followed it up on December 12, 1927, and changed its order for the appointment of a receiver to *receivers.* Their names are not given in the record. Among other things, the order directed them "to advise themselves" how to put defendant companies on a "proper financial basis," but fortunately for defendants, that "proper financial basis," according to the ideas of the district court, did not attain fruition. The defendants there, plaintiffs in error in this court, obtained a stay of execution at our hands, and on final hearing, we reversed the lower court.

Our warnings having gone unheeded, we purpose that the district court shall obey our orders, and respect the rights of others. We have directed restitution of the sum of $18,743.92, paid by the receiver, or purported receiver, to bondholders under the district court's order of August 32, 1927, with legal interest thereon. We shall further direct that other sums be restored to the fund from which

they were wrongfully taken. We mention some of the items later in this opinion.

18. Counsel for the bondholders have correctly construed our opinion in *Buchhalter v. Myers, supra,* as a "mandate" to sell and dispose of all property, real and personal, of the pulp company estate, for the purpose of satisfying all just debts and obligations of the corporation, but this means that it shall be done according to law and under principles of equity, and *not* pursuant to the Myers-Rude stipulation. In a subsequent paragraph hereof, we point out the lawful method of accomplishing that purpose.

19. On the subject of the stipulation of August 23, 1927, counsel for the bondholders seek to employ *Buchhalter v. Myers, supra,* as res judicata against the general creditors. Counsel's contention is that we there held it to be valid, at least inferentially, but that stipulation was not in issue, even between the parties to that suit, or questioned by any assignment of error there. As we said on page 429 of that opinion, only the immediate parties to that suit, Buchhalter and Myers, were involved. Since the question of the Myers-Rude agreement is not res judicata even as between the parties, certainly it cannot be said that it binds strangers to the suit. As we pointed out in that opinion, 96.5 per cent of the judgment against Buchhalter related to pre-corporation events, and 3.5 per cent to an item of $607.71, consisting of $250 salary paid Buchhalter, and $357.71 on account of gas and oil. This had nothing to do with the Myers-Rude agreement.

20. Our reference to the receivership was on account of its improvidence, and unconscionable expenses and costs incurred. On page 27 of the printed brief of counsel for plaintiff in error in *Buchhalter v. Myers, supra,* filed in this court on February 29, 1928, they remark that it was and is their view that Beck's appointment "was erroneous, if not indeed void." They further say: "However, subsequently arising considerations, partially

legal, but perhaps to a greater degree practical, caused all parties, this plaintiff in error included, to formally stipulate in the court below that the receiver might be retained and the estate of defendant corporation administered in conformity to the terms of that stipulation and finally closed by sale of its assets * * *. These considerations induced the execution of the stipulation referred to and appearing in the record at fols. 744 to 779, which was agreed to not only by all parties now before this Honorable Court in this cause but was *acquiesced in as well by all creditors of the defendant corporation.* (Italics ours.) The bankruptcy proceedings were accordingly dismissed. Hence we are not now questioning any matter or having relationship to the appointment of a receiver and no error is assigned thereon, and undoubtedly now the best interests of all affected persons requires that it be not disturbed.''

On petition for rehearing of the present case, counsel for bondholders inform us in substance, if we understand them correctly, that the above positive statement, that all creditors had acquiesced, was only an expression of the sincere opinion of counsel, based on other circumstances, but they affirmed it as a fact, and we had a right to rely on it as a statement of fact. *Highfill v. Ermence,* 73 Colo. 478, 216 Pac. 533. They should have qualified their statement. It was not well grounded even as an opinion, since the assertion was made in a brief filed in this court in the Buchhalter case only about six weeks after George N. Sparling Coal Company et al. had (on January 16, 1928) filed a petition in intervention in the district court in which, among other things, Sparling and other general creditors protested against the stipulation of August 23, 1927, and prayed ''that the stipulation and order heretofore entered hereon may be vacated.'' That bondholders knew of the objections of some of the largest general creditors only about a week after the date of the stipulation, is evident from the fact that protests of the latter resulted in a change in the wording of

508

the stipulation to dismiss in bankruptcy, to exclude the idea that they agreed to the bondholders' stipulation of August 23rd. See statement of facts, under date of August 30 and September 1, 1927.

 We cannot pass on matters withheld from our eyes. The Sparling petition in intervention was not incorporated in any of the records in this court except in the Sparling case. Furthermore, folios 538 to 560, both inclusive, of the transcript in *Myers v. Rude* (the second writ of error) shows that under date of July 2, 1929, in the district court, general creditors renewed their objections theretofore made, and protested against the confirmation of the sale, but the folios mentioned were omitted from the abstract of record and were not discussed in the original briefs. We could not determine the rights of general creditors without even knowing what their claims were, and no matter whether their complaints were justified or not, if made in good faith, as they unquestionably were, they had a right to have them reviewed by this court. *Stone v. Denver & Salt Lake R. R. Co.*, 78 Colo. 323, 241 Pac. 532.

 Counsel for Myers as well as counsel for bondholders say they wanted the first two causes decided before the others, in order to determine the validity of the attempted sale of corporate assets to Rude and Bronstine, free and clear of encumbrances. We do not say that in a proper case the rights of immediate parties inter sese cannot be determined, but all whose rights are to be affected by the result should be before the court. *Burke v. Boulder M. & E. Co.*, 76 Colo. 64, 230 Pac. 398; *Doherty v. Youngblut,* 66 Colo. 594, 185 Pac. 257; *Chapman v. Pocock,* 7 Colo. 204, 3 Pac. 219. If we may judge by the use attempted to be made of our opinion in the Buchhalter case, the object was to get an opinion in *Myers v. Beck* and *Myers v. Rude* on the validity of the sale, to be used against the world, including the absent creditors, but no one has successfully explained how to examine an abstract of title with an important page miss-

ing. The subsequent production of the missing pages of the records has made it evident that the real estate is and should be impressed with a lien in favor of the general assets, made imperative to secure the restoration of unlawful preferences awarded bondholders. They did not sue out any of the present writs of error, but they were insistent on having the first two causes decided in advance of the others, even after they were reminded of the claims of the absent general creditors. If we had granted the several requests of bondholders, it might have led to an erroneous decision awarding them the property free of liens, before the general creditors had had even a chance to be heard in the Supreme Court, to obtain relief against ex parte orders without notice in the district court. It was too much to ask of us and we are indebted to the several counsel for Rossi and George N. Sparling Coal Company et al. for their able assistance in righting a long series of wrongs. It would have been worse even for the bondholders themselves if we had said at first that they acquired a clear title, but had been obliged to declare later on examination of more complete records in the same case that the title is encumbered.

It is true that in the beginning we were inclined to yield to the urgent request of counsel for the bondholders to decide the first two cases in advance of the last two, but this only demonstrates that at the outset, before the records were fully presented, we may be charged with having taken too seriously the representations made to us by counsel for the bondholders that the general creditors had acquiesced in the stipulation mentioned. The defect of parties did not appear on the face of the first two records, but we cured it by consolidation of the four causes. We have had to deal with an unnecessary multiplicity of writs, with statements in the brief mentioned at variance with facts of record, with a needless misconstruction placed on our opinion in the Buchhalter v. Myers case after we had been incorrectly informed that the general creditors had acquiesced, with haste to get a

decision before interested parties could be heard, and with the other matters herein discussed. Under these circumstances, we feel that we were imposed upon, but are disposed, as we always are, to give full value to the assurances of counsel of their perfect good faith.

21. At a hearing in the district court on September 27, 1929, a witness, W. C. Carpenter, examined by one of counsel for bondholders, testified that he had made investigation as to which of the bondholders had received the $10,000, paid under the stipulation of August 23, 1927. He gave the following names: C. Ginsberg, $5,000; H. Silverstein, $1,000; Davis and Wallbank, $2,000; Joseph Buchhalter, $2,000. We shall first discuss the payment of $5,000 to Charles Ginsberg. We find his name mentioned, early enough for present purposes, on July 9, 1927, when, pursuant to a petition filed by Beck and Ginsberg, fees were allowed to both. The amount then ordered to be paid to Ginsberg, was the sum of $2,000. On June 14, 1928, the district court allowed Ginsberg a monthly retainer of $300, "as partial compensation for his services, * * * to take effect as of May 1, 1928, and to continue until the further order of the Court." The total fees paid Ginsberg out of general assets amounted to $7,200. Ginsberg's office as attorney for the receiver continued until February 21, 1929, when John S. Stidger was substituted.

Ginsberg, as attorney for the receiver, participated in this affair, we believe from the beginning of the receivership on May 16, 1927. In his official capacity as an officer of the court, he occupied a position of grave responsibility and trust. This is too patent to be dwelt upon. The fact that he was a beneficiary to the extent of $5,000 to the Myers-Rude stipulation, at the expense of general creditors, throws a sinister light on the affair. Ginsberg figured in disbarment proceedings in *People v. Ginsberg,* 87 Colo. 115, 285 Pac. 758, and was temporarily suspended from practice, but we were not then fully apprised of the extent of his culpability or of the part he

played in this matter from the beginning until as late as on or about February 21, 1929. It did not fully come to light until the Geo. N. Sparling Coal Company case was at issue in this court on October 30, 1930. It would be useless repetition to show the things that Beck as receiver did and did not do during the time that Ginsberg acted as his attorney, but it all adds another reason for lack of confidence in the receivership proceedings.

22. An upset price of $300,000 for pulp company assets was fixed by the court. After various efforts of one kind or another to sell the property, an order was entered on or about January 2, 1929, setting aside the upset price. Some of the plaintiffs in error complain of this order. It is conceded that the plant is subject to a great depreciation. While we must direct that the sale be set aside, it is not on the ground of removal of the upset price. We think it would be unwise to delay the winding up of the matter by insisting upon an upset price under present conditions.

23. After the removal of the upset price on January 2, 1929, the next attempted sale was on February 14, 1929. I. Rude, bondholder, bid the sum of $150,-000, and of course with the intention of using his bonds for such bid, which would have left approximately $90,-000 in bonds to be accounted for, if these bonds were outstanding. This bid was rightly rejected. At that time, February 14, 1929, the receivership had been pending for one year and eleven months. Bondholders themselves were largely to blame for at least six months delay in their hope of getting $50,000 more after it was known that the estate was insolvent, as well as a payment of $10,000 on principal and all interest, and thereafter, if the property were sold, that it be free and clear of all liens and encumbrances. The Myers-Rude agreement made a disastrous contribution to delay in closing the matter. It has proven to be a stumbling block in the district court as well as in this court and outside of court. The removal of the upset price left the bondholders in a

512

position to bid in their bonds and assist in closing the matter not later than February 14, 1929. On the equitable principle that one shall not be allowed to profit from his own wrong, no interest on bonds will be allowed from February 14, 1929, to date. We think this is exceedingly liberal to the bondholders.

24. As to ownership of bonds. Supposed bondholders, parties to the stipulation of August 23, 1927, were I. Rude, Joseph Buchhalter and Aaron Bronstein. Passing to June 6, 1929, purported owners of all bonds were I. Rude and Max Bronstine. We have traced Aaron's bond ownership down to February 18, 1929. At that time, attorney J. E. Robinson appeared for the first time in the case, and it deserves to be said in fairness to him, that it was his first appearance in the cause, which doubtless accounts for his lack of familiarity with previous events. At that hearing on February 18, 1929, attorney Robinson stated that he had just been called into the matter and represented one-fourth of the bonds outstanding, and had not had an opportunity to look into it, or to determine what to do. This was after one of the earlier attempted sales. We think the attorney was mistaken in his statement about representing one-fourth of the bonds, because he corrected it almost immediately by saying, "I represent *Mr. Bronstein* [our italics], who has $109,000 worth of the bonds." We accept the latter statement, and take it to mean Aaron. At some time thereafter, Aaron disappeared and Max, together with I. Rude, claim to own *all* outstanding bonds at the last attempted sale on June 9, 1929.

The above is preliminary to a very brief discussion of the proposition of Max Bronstine's attorneys that he should not be affected by any order of restoration of moneys paid under the Myers-Rude agreement, because he, Max, was not a party to it. This makes no difference, however, because it is self-evident that if he and Rude owned all of the bonds at the last, they or their privies owned the bonds represented under the Myers-Rude

agreement on August 23, 1927. The ownership of these bonds was not necessarily in dispute, but their efficacy from the beginning of the receivership to and including the last attempted sale, and their use as part of the purchase price of all corporate assets, at all times underlie the whole procedure, and without such ownership, so-called bondholders would have no standing in court on this ground alone. And no matter from whom Max Bronstine bought his bonds, such transfer pendente lite gave the purchaser no greater right than his vendor had to sell in its effect on the real estate security, which is the particular matter in controversy. The International Trust Company, trustee under the bond issue, is a party in the district court and in this court. It is a representative of the bondholders. *In re Quemahoning Creek Coal Co., supra.*

25. In the above connection, when the matter is tried again, the district court will require proof as to the lien of the mortgage, the amount of outstanding bonds, the ownership thereof, and the extent to which they are entitled to recognition. Such proof was at least informal before. A discrepancy which the district court should investigate, occurs in a difference between the receiver's report, filed July 2, 1929, showing assets and liabilities as of March 31, 1929, and the report of sale of assets on June 6, 1929. The first mentioned report shows outstanding bonds in the sum of $223,000, but Rude and Max Bronstine used $228,000 par value of bonds in their bid. If this means that the receiver bought or acquired $5,000 worth of bonds with receivership money or assets, it must be refunded, with legal interest thereon, under the conditions named in the fourth paragraph of this opinion.

26. Plaintiffs in error in the Rossi and George N. Sparling Coal Company cases object to the sale of all property free and clear of all liens and encumbrances. They are correct in their objections, since the general assets were unlawfully depleted in order to give a clear

title to the bondholders. Certainly a title cannot be cleared up to make it more attractive, if by so doing it wrongfully takes money to which others are entitled. One of the ways in which it was done was by paying taxes on real estate out of general assets. Taxes are essential to the support of government, but the question as to who shall pay them is another matter. Taxes paid by the receiver on the real estate are chargeable to the holders of the real estate security, and taxes paid by such receiver on personal property are payable out of general assets. As between the receivership estate and bondholders, all monies paid by the receiver for taxes on real estate will be held to be secured by lien thereon, until restored to the general fund. It may be said, that the mortgage or trust deed provides that the mortgagor pulp company shall pay all taxes, but it is also to be said that the same company promised to pay the general creditors. One argument is as good as the other.

27. There have been so many individual items of unlawful disbursement that it is impossible for us to take them all up seriatim. To consider them all in detail would entail on us the duties of a trial court, if not indeed a board of accountancy. The general classifications of priorities that we have enumerated should be sufficient to guide the trial court at the next hearing. Our omission of reference to any particular item is not to be taken in the present matter as determinative of rights pertaining thereto, except as restricted by such classifications. In other respects, we shall not unduly hamper the trial court in its judgment when the matter is tried again. We gave the trial court similar freedom when we reversed the lower court in *Northern Colo. Irr. Co. v. Denver,* 86 Colo. 54, 278 Pac. 592. We said at page 58 of that opinion, ''The court will liberally exercise its judicial discretion within the statute, to the end that there may be a full final and complete determination of all claims presented * * *, according to law, and to enter or re-enter such orders, judgment, decree or decrees as the facts

may justify.'' And the district court may also, in the exercise of such discretion under the circumstances of this case, modify, vacate and set aside other findings, judgments and decrees heretofore made and entered by such court, and acts done pursuant thereto, in order to conform to our opinion in the present cases.

28. There are approximately 125 general creditors, with relatively small claims, who are not represented by attorneys. These creditors are entitled to rely on their trustee, the receiver, but as we have seen, he failed to protect their rights. Words of the late Mr. Justice Brewer are especially apropos in this receivership. ''Indeed, it may be said to be generally true that the weaker a party and the smaller his interest, the greater the need of the strong hand of the court, to ascertain and protect his rights.'' *Montana Co. v. St. Louis Mining and Milling Co.*, 152 U. S. 160, 170, 14 Sup. Ct. 506, 38 L. Ed. 398; *Mountain States Beet Growers Marketing Ass'n v. Monroe,* 84 Colo. 300, 313, 269 Pac. 886.

29. Rossi assigns error to a ruling of the district court affecting a drain from the plant of the pulp company over his land. Counsel for bondholders assert that Rossi is concluded by our decision in *Rossi v. Beck, supra* (83 Colo. 592). This is incorrect; the matter was expressly reserved for further determination, as will be seen from the concluding paragraph of that opinion. Since the whole case will go back to the trial court, under existing circumstances, we deem it best that this claim of Rossi be reconsidered by that court. The judgment in this respect will therefore be reversed without prejudice, and a new trial ordered.

30. The combined writs of error in the receivership case now before us have produced not less than 3460 folios of mixed records, besides a book of exhibits. There are 88 assignments of error, necessary to be checked for repetitions, due to the four writs mentioned. At first, they seemed almost hopelessly tangled, on account of conflicting interests, and other matters heretofore ex-

plained. Twenty-three attorneys have entered their appearance. Twenty-seven briefs have been filed, containing over 450 supposed authorities, but very few of the citations are of assistance, for the good reason given by counsel for plaintiffs in error in the Geo. N. Sparling Coal Company case, that this matter is sui generis. No other case like it has been cited, we have found none, and have been obliged to resort almost entirely to general principles for solution of a case without a parallel. And the parties have not availed themselves of their statutory remedy, as will be presently seen.

31. The receivership never should have been commenced, but having been started, should have been ended long ago. There has been a statute in this state for over fifty years, amended in 1925, making it stronger, pertaining to the winding up of affairs of insolvent corporations. Section 1, chapter 71, pages 200, 202, Session Laws 1925, amending section 2301, chapter 38, C. L. 1921. Portions of this statute, particularly as to methods of commencing actions, have no application here. We make no attempt to justify the manner of commencement of these proceedings, but regardless of stipulations or consent, and aside from the personal controversies between Myers and Buchhalter which started the matter, nevertheless thereafter, beginning with May 16, 1927 (except during the temporary intervention of bankruptcy), the proceedings in the district court of Adams county are, or should have been, under our "winding up" statute, for the purpose of closing the affairs of the pulp company, by sale of all of its corporate assets of every kind, and paying and discharging all lawful debts and obligations as far as possible. The only possible excuse, for retention of jurisdiction by the district court was to speedily wind up its affairs *according to law*. Such proceedings, demanded by imperative necessity, are not dependent on the minor matter of dissolution of the corporate charter. Having acquired jurisdiction, and the circumstances being such as they are here, the follow-

ing excerpt from Session Laws 1925, section 1, chapter 71 above mentioned, applies:

"And courts of equity shall have full power, on good cause shown, to dissolve *or* [our italics] close up the business of any corporation, to appoint a receiver therefor, who shall have authority by the name of the receiver of such corporation (giving the name), to sue in all courts, and to do all things necessary to closing up its affairs as commanded by the decree of court. * * *

"The Court may make or render such other orders or judgments in the premises as justice may require. All orders and judgments shall be binding upon the corporation, its property and assets, its directors, stockholders, creditors and all claimants against it."

32. The above statute as originally enacted (section 2301, C. L. 1921) was copied almost verbatim from a similar statute of the state of Illinois (section 25, chapter 32, R. S. Ill.), and the supreme court of that state, and two United States circuit courts of appeals have had occasion to construe it. *Blair v. Illinois Steel Co.*, 159 Ill. 350, 42 N. E. 895; *Beet Growers Sugar Co. v. Columbia Trust Co.*, 3 Fed. (2d) 755; *American Mine Equipment Co. v. Illinois Coal Corp.*, 31 Fed. (2d) 507. In the last case, it is said at page 513: "While not technically a 'winding-up' proceeding under the Illinois statutes, it discloses all the elements of it up to the point of dissolution of the corporation. It was brought for an administration of all the assets of the corporation, their conversion and distribution among the creditors, and to do substantially everything that is done in a winding-up proceeding, save only dissolving the corporation itself." The "winding-up" statute was held applicable, regardless of the fact that the suit did not include the dissolution of the corporation. We shall follow the same ruling. See also Tardy's Smith on Receivers (2d Ed.), vol. 1, pp. 743-745.

33. Section 5078, C. L. 1921, reads: "In all cases where lands shall be sold under and by virtue of

any decree of a court of equity, for the sale of mortgaged lands, it shall be lawful for the mortgagor of such lands, his heirs, executors or administrators, to redeem the same in the manner prescribed in this act for the redemption of lands sold by virtue of executions issued upon judgments at common law; and judgment creditors may redeem lands sold under any such decree in the same manner as is prescribed for the redemption of lands in like manner sold upon executions issued upon judgments at common law. (G. S., §1860; G. L., §1428; R. S., p. 377, §23; L. '61, p. 270, §24; R. S. '08, §3657.)'' Counsel for all plaintiffs in error in the four cases before us argue that this suit is to foreclose a mortgage, and hence, the sale of all pulp company property and assets must carry with it a right of redemption. But this is not a suit to foreclose a mortgage; it is, under all present conditions, a suit to wind up the affairs of an insolvent corporation in the hands of a receiver. The right of redemption from a judicial sale of personal property does not exist in this state. *Conway v. John,* 14 Colo. 30, 23 Pac. 170. Concerning real estate, as we said in *Walker v. Wallace,* 79 Colo. 380, 382, 246 Pac. 553, ''The right to redeem is purely statutory and is not to be enlarged by judicial interpretation, yet a liberal construction is to be given the statute allowing redemption, to the end that all the property of the debtor may pay as many debts as possible. 23 C. J. p. 712, §723, and authorities there cited.'' But we have not had occasion to construe the ''winding-up'' statute before with reference to this matter, and *Blair v. Illinois Steel Co., Beet Growers Sugar Co. v. Columbia Trust Co.* and *American Mine Equipment Co. v. Illinois Coal Corp., supra,* which construe a statute similar to ours, hold that there is no right of redemption from sales made under it. We shall follow these authorities on principle as well as precedent.

 34. In Pomeroy's Equity Jurisprudence (4th Ed.) vol. 4, p. 3615, §1540, it is said: ''It is well settled, with scarcely a dissenting voice, that in the absence of

express statutory authority, a court· of equity has no power to dissolve a corporation, or to wind up its affairs and sequestrate its property.'' We so held in .*People v. District Court,* 33 Colo. 293, 80 Pac. 908, but also showed the impossibility of making use of the statute against a solvent, going concern, a point in *People v. District Court, supra,* not applicable to the pulp company in its present stage. It now *must* be wound up. The Illinois citations are contained in the briefs of counsel for the bondholders; those decisions are based on a ''winding-up'' statute and as we have said, ours was copied from theirs. It seems strange that a foreign statute should be discussed, and that no reference was made to our own, especially as equity of redemption from sale of real estate would follow, were it not for this Colorado statute. It appears to have been lost to view in the melee over the Myers-Rude stipulation, which was sought to be employed as a substitute for the law.

35. The ''winding-up'' statute (§1, chapter 71, S. L. 1925) contains no regulations as to how a receiver's sale shall be conducted thereunder. It is a judicial sale, and must be fairly and impartially conducted by the officer who makes it, as a representative of the court, and since there are no statutory restrictions as to time, manner, terms and notice of sale, such matters are to be determined by the court. *Northland Pine Co. v. Northern Insulating Co.,* 145 Minn. 395, 177 N. W. 635; *Stokes v. Williams,* 226 Fed. 148; In Re *Haywood Wagon Co.,* 219 Fed. 655; *Bailey & Collins v. Ryan Cotton Oil Mill Co.,* 119 Okla. 57, 248 Pac. 321. Courts of equity are vested with broad discretionary powers in this respect. *Gockstetter v. Williams,* 9 Fed. (2d) 354. It must be understood that we are confining these remarks to proceedings under the statute above cited, and unless there is some good reason beyond anything offered in these records, immediate steps should be taken looking toward a sale of all corporate property and assets. The sale should not be unduly postponed to await the settlement

520

of determination of matters on which the sale is not dependent. Such a course might delay it indefinitely. *Pewabic Mining Co. v. Mason,* 145 U. S. 349, 12 Sup. Ct. 887, 36 L. Ed. 732. The property should be sold subject to existing liens, unless they be paid off and discharged. It is not on account of the use of equitable and statutory powers of the court that we are directing the sale to be set aside, but on account of the abuse of such powers, and since we have said that the title to the real estate is impressed with liens to secure the repayment of moneys into the general fund of the estate, it must be readily apparent that we cannot affirm the district court's confirmatory order and decree.

36. Another matter not regulated by the "winding-up" statute relates to sales of corporate assets in whole or in parcels. In many instances, the corporate property may consist of real and personal property and intangible assets so intermixed that it is advisable, and indeed often necessary, to sell them as a whole, in order to obtain the best possible price. This is another matter that must be left to the wise discretion of the court. 35 C. J., p. 36, §48; *National Bank of Commerce v. Corliss,* 217 Mich. 435, 186 N. W. 717. The pulp company assets are of such a character that the district court should have no difficulty in separating the property to be sold in gross.

37. No court order is necessary to enable a litigating stockholder to bid at a sale of the assets of the corporation under a decree in the suit in which he is a litigant. *Pewabic Mining Co. v. Mason, supra.* This applies to Myers, holder of a large block of preferred stock in the pulp company, in whose favor such an order was granted. In his case, the order is even more objectionable, because it allows him or his assignees to use such stock in payment of the purchase price, under certain conditions, most of which have reference to the Myers-Rude stipulation. Aside from the fact that Myers needs no court order to enable him to make a cash bid, the

same as any one else, and also the confusion incident to any such order, it is erroneous in other particulars. It is to be remembered that Myers' stock is in the debtor corporation. To permit him to so use it suggests the idea of using a debt to pay a debt, or at least stock in an insolvent corporation with which to buy its assets. It cannot be done and the order will be set aside.

38. We cannot let the bondholders escape reproach for the amazing attempt of some of them to fasten on this court the responsibility for delays which they themselves have caused, and the prodigious amount of unnecessary labor imposed upon us by a multiplicity of writs of error, caused by bringing the receivership matter to this court in installments. It was led by counsel for Myers, to which counsel for the bondholders readily acceded. We believe that some of them unnecessarily led themselves into a maze that they little realized. Attorneys for Rude and Bronstine, who wanted this case decided last *May*, filed their last brief involving the same questions, in the following *September*. The matter was not fully at issue until October 20, 1930, and on October 15, 1930, this court, sua sponte, pursuant to our rule 41, abridged the time for filing further briefs. We advanced the causes on our hearing calendar, but at best, no justice of this court can wholly disassociate himself from participation in other causes.

In *Myers v. Beck, supra,* there were numerous stipulations for extension of time for filing records and briefs. We must repeat the admonition contained in *Northern Colo. Irr. Co. v. Denver, supra,* at page 58 of that opinion: "It is scarcely considerate that numberless requests and stipulations for time should be filed, and the court thereafter be asked to speed up, when the engagements of counsel admit of their attention to the matter in hand. * * * but if they lose their place on our calendar by their own acts, justice to other litigants does not permit that their causes be set aside when counsel find themselves again ready. We are glad to accommodate

522

attorneys, but we must not be asked to assume responsibility for delays beyond our control."

39. In addition to the foregoing matters, the order releasing and discharging the bond of the receiver is reversed. Neither the receiver nor his bond or bondsman shall be released or discharged unless and until the receiver shall have fully complied with the directions contained in this opinion and in *George N. Sparling Coal Co. v. Pulp Company, supra,* as well as with all such orders, judgments and decrees against the receiver as the district court shall make in the premises. The order and decree discharging the receiver is reversed, but he shall not exercise any further discretionary powers, or perform any official act or duty except as directed by the district court. The district court may discharge him at such time as it shall deem best, consistent with this opinion. The order and decree approving the final report of the receiver, and all other orders, judgments and decrees of the district court in the receivership matter in any wise inconsistent with this opinion, whether specifically mentioned by us or not, are reversed. All property and assets of every kind, belonging or relating to the Colorado Pulp and Paper Company, by whomsoever held or controlled, shall be held to abide the further orders of the district court. If such court deem it necessary to appoint another receiver with the usual powers, and to correct previous mistakes and abuses of authority, it may do so.

40. In view of the history of this case and the extraordinary character of the errors committed, some of the justices, including the writer of this opinion, believe that an order should be entered immediately, declaring the district judge disqualified to act further in the matter, but we reserve that question for further consideration.

The judgment is reversed and the cause remanded with directions for further proceedings not inconsistent with this opinion. Costs to be taxed to Joseph Buchhalter, I. Rude, Aaron Bronstein and Max Bronstine.

MR. JUSTICE BUTLER not participating.

*On Rehearing.*

*En Banc.*

MR. CHIEF JUSTICE ADAMS.

Opinion modified and rehearing denied, in accordance with our decision on petitions for rehearing and modification in No. 12,590, *George N. Sparling Coal Co. v. Colo. Pulp and Paper Co.,* 88 Colo. 523, 299 Pac. 41.