No. 12,590.

George N. Sparling Coal Company et al. *v.* Colorado Pulp and Paper Company et al.

(299 Pac. 41)

Decided January 13, 1931.   Rehearing denied May 18, 1931.

Messrs. Hodges, Wilson & Rogers, Mr. Clarence A. Brandenburg, Messrs. Lewis & Grant, Mr. Robert L. Stearns, Messrs. Pershing, Nye, Tallmadge & Bosworth, Mr. Lewis A. Dick, Mr. Frederick P. Cranston, for plaintiffs in error.

Mr. John S. Stidger, Mr. Charles Rosenbaum, Messrs. Blount, Silverstein & Rosner, Messrs. Van Cise & Robinson, Mr. J. E. Robinson, Mr. Ernest Morris, Messrs. Davis & Wallbank, Messrs. Hughes & Dorsey, for defendants in error.

*En Banc.*

Mr. Justice Adams delivered the opinion of the court.

The George N. Sparling Coal Company and other general creditors of the Colorado Pulp and Paper Company, hereinafter called the company or pulp company, an insolvent corporation in the hands of a receiver, prosecute this writ of error to review various orders and decrees entered by the district court in the receivership matter. Plaintiffs in error will hereafter be designated as "Sparling," to include them all. The defendants in error herein are the Colorado Pulp and Paper Company, George W. Beck, as receiver thereof, Charles B. Myers, Joseph Buchhalter, Moses Buchhalter, Morris H. Block, Maurice H. Levy, Edward I. Levy, International Trust Company, I. Rude, Max Bronstine, Aaron Bronstein, Harry C. Davis and Stanley T. Wallbank.

This is a companion case to *Myers v. Beck,* 88 Colo. 457, 299 Pac. 50; *Myers v. Rude,* 88 Colo. 459, 299 Pac. 50, and *Rossi v. Colorado Pulp and Paper Co.,* 88 Colo. 461, 299 Pac. 19. The present case (Sparling's), and the three others mentioned, all arise out of one suit in the district court of Adams county, the receivership matter, numbered and entitled, "No. 2367, Charles B. Myers, plaintiff v. Colorado Pulp and Paper Co., et al., defend-

ants." The four causes in this court have been consecutively prosecuted to review orders and decrees of the lower court. The circumstances under which a multiplicity of writs of error have been sued out to review proceedings in one suit, are explained in our opinion in *Rossi v. Pulp Company, supra.* The four causes in this court overlap, and taken as a whole, contain repetitious assignments of error. We have consolidated them for final determination and they are all decided on this day. Our main statement of facts is contained in the Rossi case, and our opinion in each of the several causes applies to all of them. They should be read together. In reaching our conclusions we have made free use of the records and briefs filed under the four writs of error.

■ 1. Our rule 35 reads: "Counsel will be confined to a discussion of the errors stated, but the court may, in its discretion, notice any other error appearing of record." We have employed this rule in the present instance, for reasons that must be apparent from a reading of the Rossi opinion.

■ 2. In *McClelland v. Merchants & Miners Nat. Bank,* 77 Colo. 302, 308, 236 Pac. 774, we said: "Whether the liquidation of the affairs of the bank be voluntary or involuntary or whether it proceeds under the authority given to continue the bank in existence in order to close up its affairs, it is necessarily implied that the respective rights, not only of the creditors and debtors of the bank, but of the stockholders, are to be determined as of the time when it commences." In the instant case, the controlling date is May 16, 1927, when the receiver was appointed and took charge.

■ 3. As said in Clark on Receivers, (1st Ed.) page 742, paragraph 678, "Creditors of a receivership whose claims had been proved and allowed under a decree have a right to be heard in that court upon any actions of the court or the receiver, by which they might claim to be aggrieved."

Our opinion in the Rossi case shows that there were

urgent reasons why the Sparling petition in intervention, filed January 16, 1928, should have been allowed, but since we have held the Myers-Rude stipulation to be void as against the rights of general creditors, and have determined other matters in such petition in Sparling's favor, we hope that this has overcome many, if not all, of the difficulties of general creditors. They will be allowed to reframe their petition, if they so desire, to meet the present situation.

4. On December 3, 1927, the claims of Sparling and other general creditors were allowed and judgments entered thereon in this proceeding. These claims amount approximately to the sum of $50,000. On November 26, 1928, plaintiffs in error in the present Sparling case, entered into a stipulation with the receiver, wherein it was agreed on certain conditions, that such creditors would accept sixty-five per cent of the face value of their claims in full settlement. On December 20, 1928, the court approved the stipulation, which was to effect that $10,000 should be paid immediately, and the balance in installments as rapidly as possible. The $10,000 was paid, pro rata among such creditors, but no more. At the time the stipulation was made, there was an upset price of $300,000 fixed by the court on the property. Instead of paying the creditors, the upset price was later removed, the property deteriorated and depreciated in value, Beck's liberal compensation and other receivership expenses continued, and about eighteen months after the stipulation was made, the pulp company real estate was struck off and attempted to be sold to two bondholders for $228,000, with their bonds as the purchase price. On account of this, the creditors were not paid any further sum beyond the $10,000, amounting to twenty per cent of their claims. Nevertheless, the district court held them to their agreement to pro rate on future dividends on a sixty-five per cent basis, as against one hundred per cent on other general claims, including the deficiency judgment for $24,242 in favor of Rude and Bron-

stine. This was serious error. The promise of the general creditors to accept sixty-five per cent carried with it a promise on the part of the receiver, express or implied, to *pay it,* and that it should be paid within a reasonable time. Instead of receiving it, they have been compelled to litigate with the receiver not only as to this matter, but in many other things, on account of unlawful encroachments on the general fund, which is the general creditors' only source of payment. Such claims will be restored to a basis of one hundred per cent, with legal interest from the date of rendition of judgments thereon.

5. Sparling assigns error to the entry of the deficiency judgment in the sum of $24,242, in favor of I. Rude and Max Bronstine, purchasers at the attempted sale of all corporate property of the pulp company. Since we have directed that the sale be set aside, the deficiency judgment will fall with it, and it is unnecessary to discuss other arguments concerning it.

6. Sparling's eleventh assignment of error is that the court erred in overruling objections made to the several reports of the receiver. It is discussed in connection with other assignments. As we said in the 27th paragraph of our opinion in the Rossi case, "There have been so many individual items of unlawful disbursement that it is impossible for us to take them all up seriatim." We have therefore resorted to general classifications, which is amply sufficient for all present purposes. In paragraph 39 of the Rossi opinion will be found a general clause reversing orders, judgments and decrees inconsistent with this opinion, whether specifically mentioned or not. This is intended to give the district court a wide latitude, to correct all errors that have been made, whether as to unlawful preferences or otherwise. Complaints may be presented to the district court by any interested party, in such manner as the court may direct. This is the only way that an affair of this magnitude can be terminated, and justice be done to all concerned.

7. We here refer to the summary of fees and allowances to the receiver and his attorneys, as follows:

"George W. Beck as Receiver $ 5,500.00
George W. Beck as General Manager 12,500.00
George W. Beck, Receiver, additional
   allowance 2,000.00

Total $20,000.00

Receiver's Attorneys:
Charles Ginsberg $7,200.00
Clifford J. Gobble 500.00
John S. Stidger 1,500.00
John S. Stidger 1,500.00

Total 10,700.00

Grand Total $30,700.00"

A comparison of the above with the balance of about $40,000 and interest due general creditors, does not need much comment.

At this time we shall pass on only the one item of $2,000 additional allowance paid Beck as receiver. As shown by our statement of facts in the Rossi case, on January 26, 1927, Clifford J. Gobble, an attorney at law, practicing in Denver, and who is mentioned above as having been one of the receiver's attorneys, mailed a letter to the clerk of the district court at Brighton, Adams county. This letter is as follows:

"July 26, 1927.

"Geo. M. Griffin,
  Clerk of the District Court,
   Brighton, Colorado.

"Dear Sir:

"Enclosed herewith please find the following papers:

Petition of Receiver and Order of the Court to Repair Roof of Plant.

Order allowing Compensation for Receiver.

Order for Receiver to Defend Bankruptcy Proceedings.

"Please file the papers in case No. 2367, Charles B. Myers vs. Colorado Pulp and Paper Company.

Very truly yours,

(Signed) Clifford J. Gobble."

The "Order allowing Compensation for Receiver," mentioned in the letter, has reference to the $2,000 in question. The papers mentioned in the letter reached the clerk of the district court and were filed by him on July 27, 1927. The original letter is contained in the record and also the envelope in which it was enclosed. The envelope is post marked "Denver, July 26," and a photostatic copy of the order is enclosed, which shows an alteration in the date. It is claimed that the order for additional fees was made on July 26th, but that the date was changed to July 20th, so as to antedate the first petition in bankruptcy filed on July 23, 1927, and thereby escape the jurisdiction of the bankruptcy court. All surrounding circumstances bear out this conclusion. Another order, which authorizes the defense of the bankruptcy proceedings, is enclosed with the letter, is dated July 26th, and of course presupposes knowledge of such proceedings. The orders indicate that they were prepared at the same time, except for the mutilated date on the order allowing Beck $2,000 additional compensation. It will be set aside and Beck is ordered to refund the same. We do this with less hesitancy because we feel that he has been grossly overpaid. As to further refunds, if any, to be made by him on account of fees or compensations in any capacity, and also as to the fees paid to various attorneys, we believe, in view of our expressions of disapproval of the conduct of this matter from beginning to end, that counsel should be given a further opportunity to present their views on petition for rehearing.

The judgment is reversed and the cause remanded,

with directions for further proceedings not.inconsistent with this opinion. Costs to be assessed as directed in *Rossi v. Pulp Company.*

MR. JUSTICE BUTLER not participating.

*On Rehearing.*

*En Banc.*

MR. CHIEF JUSTICE ADAMS.

VARIOUS petitions for rehearing and modification of opinion have been filed in this case as well as in *Myers v. Beck, Myers v. Pulp Company* and *Rossi v. Pulp Company,* all of which were consolidated and decided concurrently. General creditors do not ask for rehearing or modification except that some of the parties petition "for further and final determination of certain issues," which we left open for further consideration. That which we shall now say regarding the several applications will apply to the four causes named.

One of the questions left open relates to the fees allowed and paid George W. Beck, presented under separate assignments of error by Rossi and George N. Sparling Coal Company, and by cross assignments by bondholders. Creditors insist that such fees are grossly excessive, unreasonable, unjust, not warranted by the law or evidence, the services rendered or the results obtained, and that such fees involve duplicate payments for precisely the same services performed as receiver and general manager. We have directed the disallowance of one item in the sum of $2,000 and shall now consider the others, consisting of the sum of $5,500 paid and allowed as receiver's fees and the further sum of $12,500 on account of compensation as general manager.

Present counsel for the receiver says that the latter "has been commended by all parties on the manner in which he took charge of what was then an insolvent cor-

532

poration,'' and that his business ability is unquestioned, but no such encomiums in the records or briefs have been called to our attention, and if the corporation was insolvent when the receiver took charge, it was more so when he quit. His reports show that he conducted the business at a loss, and when he surrendered control, the estate was more deeply involved in litigation than ever, due largely to his own acts. And, aside from his reports, there is no computation of the loss of time and money to the general creditors in their incessant struggle to protect themselves from their own trustee.

Beck was appointed as receiver of an insolvent corporation with orders to conduct it as a going concern with well-nigh plenary powers from the court, and a blanket injunction was issued to prevent interference with the performance of his duties. The order appointing him general manager accomplished little if anything except to increase his emoluments. The receiver's compensation is not to be measured by the number of his official titles covering the same duties. It may be added that he devoted only part-time to the pulp company business. His testimony shows that he was acting as receiver for two other companies and was also interested in a private business, although he testified that he devoted very little time to the latter. In respect to the pulp company, he said: ''I spent what time was necessary at the mill, sometimes one or two hours each day, then went back to the office.'' This does not necessarily indicate that it was all the time that he spent on the pulp company business. He testified that he handled collections personally and solicited orders; he devoted part-time in his own office with his various enterprises, including the pulp company. Much time was consumed on legal matters, but to a large extent they were superinduced by his own unlawful acts against creditors and their resistance thereto from court to court. He argues justification in that everything he did was approved by the district court, but if this were a justification in every case,

it would deprive this court of ultimate supervisory powers over the receiver as well as the district court. We cannot either surrender this right or avoid our obligation to direct the course of judicial procedure.

The record speaks for itself, and for the reasons heretofore stated, we must direct, in addition to the disallowance of the $2,000 item, that the sum of $12,500 paid and allowed the receiver as general manager be also disallowed as excessive and unwarranted, and that he restore to the pulp company estate all sums paid him as fees or compensation in excess of the sum of $5,500. It would not be without precedent if he were deprived of all compensation (*Covington v. Hawes-LaAnna Co.*, 245 Pa. 73, 91 Atl. 514, Ann. Cases 1915D, pages 1254-1257), but we do not deem it best to disturb the allowance of $5,500 paid him for his services as receiver. This will be in full, and will liberally compensate him for all of his work.

Fees of attorney Stidger. He did not come into the case until February, 1929, long after the bondholders' stipulation had become a fixture in the district court. He calls our attention for the first time to matters not briefed before, some of which were not even abstracted, from which it appears that he was greatly handicapped and embarrassed in the performance of his duties, especially for the reason that his correct views as to the invalidity of the above stipulation were neither in accord with those of the receiver, whom he was called upon to represent, nor with the attitude of the trial court with respect to it. Their views, irreconcilable with those of this attorney in many respects, checked efforts that otherwise he might have made, and added to his burdens. The order of the district court as to the amount of fees allowed Stidger will not be disturbed, nor those of attorney Walker who appeared as special counsel in the oral argument in this court in *Myers v. Beck* and *Myers v. Rude*.

As to fees allowed attorneys Ginsberg and Gobble. This cause goes back to another judge for final dis-

534

position as to these questions, also auditors' fees and other matters. Many elements, not fully before us, may be necessarily taken into consideration in fixing such amounts, and nothing we have said should be interpreted as an attempt to interfere with the exercise of the discretion of the trial court in the final determination thereof. It will be guided by the general directions contained in the 27th paragraph of the Rossi opinion, and all persons who are not parties hereto will have an opportunity to be heard on any matter affecting their rights. We have not said that secured creditors have no right to participate in general assets in case their security is inadequate. See *Erle v. Lane,* 22 Colo. 273, 44 Pac. 591.

The agreement of August 23, 1927, signed by Buchhalter, and others, shows that bondholders instituted the bankruptcy proceedings and had, or procured, certain creditors to file involuntary petitions against the pulp company. Later, certain general creditors filed applications for dismissal there. Some of them referred to Buchhalter and his associates as "instigators" of the proceedings, giving details; other creditors said they were "misled." The records before us fail to show that Buchhalter or his associates denied the charges, though Buchhalter objects to our use of the words "misrepresented" instead of "misled," but we used the words synonymously and we see no reason why we should not have done so in this connection. Counsel for the bondholders themselves introduced copies of some of the federal court records into this case and we must assume that they brought in all that were favorable to their cause.

No petition filed herein is sufficient to convince us that we have overlooked or misapprehended any point to entitle any petitioner to a rehearing under our rule 48. We are more persuaded than ever that our decision is right. With the present additions, our opinion stands as originally written, except that we have revised paragraph 20 of the Rossi opinion as it now appears therein, to show

further facts and authorities in support of our conclusions.

One of the petitions for rehearing calls our attention to the fact that since the opinion herein was announced, the trial judge has ordered a transfer of the cause to another. If so, he was wholly without jurisdiction to so order while the matter was pending in this court. In view of what we have before said, we cannot, of course, without entirely ignoring our constitutional duty to exercise "a general superintending control over all inferior courts" (Colorado Constitution, section 2, article 6), permit that this case be further controlled by the judge who has heretofore heard it. We therefore direct that, upon issuance of mittimus herein, all further proceedings herein shall be conducted before the present presiding judge of the second judicial district.

Opinion modified and rehearing denied.

MR. JUSTICE BUTLER, not having participated in the original decision in any of the four consolidated cases, did not participate in the decision of the petition for rehearing.

### On Rehearing.

MR. JUSTICE HILLIARD, dissenting.

I did not, for the obvious reason that I was not then a member of this court, participate in the original consideration of this case and the three others decided with it. I have, however, given attention to the records, briefs and petitions for rehearing and modification. My study of these things convinces me that the petitions should be granted, and I shall endeavor to set forth the reasons which prompt me to believe that the opinions do injustice to many of the parties, the receiver, counsel and the trial judge.

In the opinion of the court my brethren have under-

taken to review a number of reported decisions of this court in which it was found necessary to reverse judgments of the judge from whose decisions the present cases were brought here for review. Not because any of those cases presented points of law which should have governed us in these matters, but as indicative, so it is said, of the general disposition of the trial judge to appoint receivers. I have examined the records in those cases and I am unable to perceive any abuse of power. Error of law there may have been. In *Pomerantz v. National Beet Harvester Co.*, 82 Colo. 482, 261 Pac. 681, the receiver was appointed, *by consent of the company,* although the claim upon which the appointment was based amounted to but $16. Much is made of this in the opinion of the court here, but the fact is that the claims then outstanding against the company aggregated nearly $100,000, and that it was unable to pay them. The appointment of the receiver was sustained by this court so I suppose if it were reprehensible the responsibility is not solely upon Judge Johnson. Many other receiverships have been before that court wherein the actions of the court were not questioned. Should not these be cited as indicative of the fact that the trial court's handling of such matters is highly satisfactory?

It should be borne in mind that the first judicial district is geographically peculiar. It entirely surrounds the City and County of Denver, the second judicial district. It is rural except for the portion immediately adjacent to the Denver county line. Just outside of this line, with the motive of escaping the burdens of municipal taxation and the like while retaining the advantage of nearness to principal markets and sources of supply, many industrial plants have located. These, of course, are all in the first judicial district. When one of these concerns becomes involved in the difficulties, which unfortunately assail the plans of men, recourse is often had to receiverships. Has the district court of that district any alternative except to hear them? It seems not under

section 26, Code 1921. Doubtless the judge of that district is not anxious to have the distressing burden of such cases thrust upon him, for they are notoriously involved, difficult of decision, and the source of marked recrimination between the classes of creditors. The cases here involved are samples and as the court says in its opinion (paragraph 30 of the Rossi case): ''The combined writs of error in the receivership case now before us have produced not less than 3,460 folios of mixed records, besides a book of exhibits. There are 88 assignments of error, necessary to be checked for repetitions, due to the four writs mentioned. At first, they seemed almost hopelessly tangled, on account of conflicting interests, and other matters heretofore explained. Twenty-three attorneys have entered their appearance. Twenty-seven briefs have been filed, containing over 450 supposed authorities, but very few of the citations are of assistance, for the good reason * * * that this matter is sui generis. No other case like it has been cited, we have found none, and have been obliged to resort almost entirely to general principles for solution of a case without a parallel. And the *parties* have not availed themselves of their statutory remedy, as will be presently seen.'' And yet my brethren have condemned the trial judge because he failed to overcome these obstacles in the heat and hurry of hearings and trials at nisi, and fell into errors of law, and was confused by the utter lack of precedent, and failed to comprehend and correlate 3,460 folios of ''mixed records'' which he largely *heard read* and did not have opportunity in cloistered silence to ponder over, and otherwise did not arrive at the same conclusions this court has reached after months of study. I do not believe that judge has been anxious to precipitate receiverships and I imagine he would be happy if these corporations which trouble him would move back into the second judicial district and leave him to settle the more simple problems of rural communities.

It has puzzled me greatly, I must confess, why my

brethren have thought it proper to order these cases to be tried or heard before another judge when mittimus shall issue. I have searched in vain for a single intimation by any party of the literal hundred that were before the court that Judge Johnson's integrity, fairness of spirit or ability could be or was questioned. No one of them asked that another judge preside, although the Code provides ample remedy in that respect if any be dissatisfied. §§31, 32, Code 1921. Nor does the record disclose that any of the parties who have sought this review are of the opinion that a different judge should preside, or do aught but discuss errors properly assigned on exceptions respectfully saved and graciously allowed. We have no power, in my judgment, to make the order that the presiding judge of the second judicial district, or of any other district, shall hear all further proceedings. Article 6, section 2, of the Constitution, cited in support of that order, gives no such right. That section reads: "The supreme court, except as otherwise provided in this Constitution, shall have appellate jurisdiction only, which shall be co-extensive with the state, and shall have a general superintending control over all inferior courts, *under such regulations and limitations as may be prescribed by law.*" My brethren have, I apprehend, overlooked the part I have italicized. We must look to the statutes to find our power and, if we do, we ought not to hold that these cases shall be heard by any judge save Judge Johnson, unless it be under the provisions of the Code last above cited or under the provisions of sections 5709 and 5711, Compiled Laws 1921. It would seem it is not what this court may think proper, but what Judge Johnson may think proper, that controls the situation. Only an abuse of his discretion in the application of those provisions would warrant our interference, and, as I have said, no party has asked that it be done, below or here. Nor, I think, should we criticize Judge Johnson because, as is alleged in one of the petitions for rehearing, he has ordered the transfer of these cases to another judge.

Perhaps he felt, in view of the statement of the court in paragraph 40 of the opinion in *Rossi v. Colorado Pulp and Paper Company,* 88 Colo. 461, 299 Pac. 19, that "some of the justices, including the writer of this opinion, believe that an order should be entered immediately, declaring the district judge disqualified to act further," it would be consistent with good taste to call in another judge. I hardly see the justice, in any event, of condemning him for doing what is now solemnly ordered, and I can fancy that he is puzzled to know just what to do to meet the approbation of this bench. Nor do I see why "he was wholly without jurisdiction to so order while the matter was pending in this court." I do not know, of course, but it is not beyond the realm of reasonable probability that a great many things properly to be heard in the district court while the case was here could have arisen.

It pains me to be obliged to say many of the things I feel it my duty to set forth herein, but I have to choose between that course or by silent or formal acquiescence be thought to have approved what I am forced to conclude is rare injustice. My justification will be found in the language employed in the opinions. I cannot believe that they are well considered, temperate or justified. As I view the opinion the court manifests a feeling that has operated to foreclose any possibility of dispassionate review. There is an absence; as I read them, of appreciation of the difficulties attending this litigation. The amount at stake was large. The company, although insolvent, represented an investment in excess of $500,000. Some very able lawyers, as I learned in my practice at the bar, represented the conflicting interests and conducted their cases as determined, resourceful and well-advised men do. Coupled with the difficulties inherent in such litigation, it came at an untoward economic time. The upset price fixed, which would have paid all creditors, secured and unsecured, in full, could not be obtained after repeated efforts, and a sale without it was

ordered and made. Differences of opinion as to the propriety of this sale arose, as is not only not uncommon, but almost always the case. Contests that had raged before the sale were intensified and the lawyers, urged forward by clients anxious to retain the benefits of the sale or gain benefit by its disapproval, redoubled their efforts. Such contests always attend such matters and judges, either upon the trial bench or in appellate tribunals, if they themselves keep an even keel, quietly and patiently determine the problems presented, and then, without feeling, adjudge with their best light. Judgments even when so arrived at, as in all things not capable of exactness, will be shot through with human limitations and imperfections, and to some of the litigants it will always appear that a great wrong has been done. That feeling will obtain with the same intenseness whether the judgment be that of a trial court or of a reviewing court. It it important, therefore, that judges whether at nisi or here shall refrain from expressions of impatience and anger. An angry man, judge or otherwise, cannot and will not deal justly with the object of his anger. And as his anger grows with his words of castigation, his sense of justice so departs from him that he will visit his displeasure, not alone on the first object of his wrath, but upon all those he suspects to be on friendly terms with him. I fear these thoughts are in point here.

I have known Judge Johnson many years. The reflections upon him that it seems our reports must forever bear witness to I feel to be without warrant. It is not in the records in these cases, as it is not in those records what Judge Johnson has done in other cases discussed by my brethren, yet inquiry as to him should not be without profit. He came to the state as a child, the son of a pioneer Jefferson county resident. He enjoyed a generous education and practiced law for many years. In 1912 he was elected district attorney of the first judicial district and reelected. While serving his second term in that office he was elected district judge, and in 1924 and

1930 rechosen. An older brother, Frank T. Johnson, for 12 years was a judge of the second judicial district. From such a family, with such a background, with the repeated evidence of the faith and confidence of the people, it is difficult for me, considering those things and the records in these cases, to understand why severe condemnation should be visited upon this man. Whatever we may think of his judicial ability, and he has erred as have so many other judges, the determination as to who shall or shall not preside in the district courts of the counties comprising the first judicial district rests not with us but with the people who five times in 18 years have returned this man to office.

With the exception of Chief Justice Adams and myself all the members of this court were district judges. Our reports are enduring evidence that their conceptions of the law were not always in accord with those entertained by the judges of this bench. As was said in *Mesa County Ass'n v. McKinney,* 81 Colo. 513, 256 Pac. 13, even judges do not know the law, as is witnessed by the existence of courts of appeal.

If Judge Johnson fell even into serious error in these cases, I respectfully suggest that he has many precedents therefor. The Supreme Court of the United States has felt obliged to overturn decisions of this court; I presume its decisions are not free from error. But I have not heard it urged before, that because district judges have been reversed, that they were not nevertheless desirable district judges, nor does the fact that those of my brethren who were district judges were reversed indicate they were undesirable district judges or unfitted for this bench. Law, unfortunately, is not an exact science or even nearly so.

It is said in paragraph 15 of the Rossi decision that Judge Johnson failed to understand earlier opinions of this court. I am sufficiently recently from the bar to be able to say that district judges have no monopoly of such failure, and it is not wholly due to lack of intelligence on

the part of the bar. Lawyers understand, and judges should not forget, that diversity of facts, not lack of alertness of intellect or perception of legal principles, is what makes the judgments of men appear to vary.

In the first of the Canons of Ethics, printed in our rules and recommended to the bar by rule 83e, it is enjoined upon lawyers that they should maintain a respectful attitude toward the courts, "not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges, not being wholly free to defend themselves, are peculiarly entitled to receive the support of the bar against unjust criticism and clamor. Whenever there is proper ground for serious complaint of a judicial officer, it is the right and duty of the lawyer to submit his grievances to the proper authorities * * *." Judge Johnson was not only "not wholly free to defend" himself here, but powerless to do so. I doubt the propriety of our commending to the bar the observance of a canon which I submit we have ourselves violated.

Reverting again to Judge Johnson's admitted inability to understand earlier opinions of this court, I find some justification to exist; certainly with respect to our decision in *Buchhalter v. Myers,* 85 Colo. 419, 276 Pac. 972. It seems to me he had rather good ground to believe that the receivership should be continued and the property sold under the now vicious Myers-Buchhalter stipulation. His endeavor to carry out what it would appear this court desired ought not to be charged up against him. It is true that this court has now found many reasons why it was erroneous for the district court to do what it thought had been ordered, but I reiterate what I said above, that a district judge does not consider these matters with the deliberation and opportunity for research that characterizes the working of appellate courts. Besides, I cannot agree with the severe criticism of this stipulation. The good faith of the parties to it *at the time it was signed* has not been assailed and my opinion

is that they were then at least in the utmost good faith. A fair reading of the stipulation will make that certain. It was the hope of those who entered into it to discharge all the debts, secured or otherwise. It failed, but as we said in *Buchhalter v. Myers,* 85 Colo. 419, 439, hope often perishes and "every man knows that the steel engraving or lithograph and gold seal on a bond or stock certificate laid away in a tin box may be eloquent only of a secret sorrow." So, too, I imagine many of the signatories to that stipulation would that their hands had withered before they put their names to that ill-fated and litigation-provoking document that they fondly believed was to avoid the "prospect that in the event of litigating all matters involved herein, such litigation will be long drawn out and expensive."

In paragraph 26 of the Rossi opinion it is ordered that the taxes paid by the receiver on the real estate out of the general funds be decreed to be a lien thereon until the amount thereof be restored. It is said that "Taxes paid by the receiver on the real estate are chargeable to the holders of the real estate security, and taxes paid by such receiver on personal property are payable out of the general assets." At another place it is conceded to be the law in this jurisdiction that creditors having mortgage security may assert a deficiency against the general assets. Why the real estate should be alone chargeable for taxes paid on it, while the general fund is to pay taxes on the personalty, is a point that escapes me. The general fund here in question was created from operation of the plant. The real estate is a very substantial and essential part of the plant, and for that reason it would seem to me that some more equitable method of apportioning the money paid for taxes would be proper. The bondholders had and have a valid claim to payment of their bonds under the terms of the deed of trust securing them, and it is a manifest injustice to them to require them to permit the use of their security in the creation

of a fund out of which taxes are to be paid, not on the security, but on other assets.

A great deal is said in the opinion of the court concerning an order said to have been signed by Judge Johnson on July 26, 1927, and then altered to show it was entered on July 20. Whether or not that is a fact is questionable. There is no finding on it and the surmise that it was altered is found in the briefs and adjudged by this court upon such statements and examination by this court of a photostatic copy. I believe we should hesitate to make so damning an assertion upon such a record. It is, however, actually a matter of little moment so far as the law is concerned. The motive assigned for the alleged alteration is that it was done to circumvent the effect of the filing of a petition in bankruptcy on July 23, 1927. The theory of the court, as expressed in paragraph 5 of the Rossi opinion, is that the bankruptcy law is paramount and (paragraph 6) "when the jurisdiction of the state court was ousted by the petition in bankruptcy, it ipso facto deposed Beck as receiver." *May v. Henderson,* 268 U. S. 111, 69 L. Ed. 870, is cited to support this theory, but I believe its effect is misapprehended. The substance of that decision is that where the possession of the officer of the state is colorable, and especially where, as there, the claim or lien asserted accrued during the four months antedating the bankruptcy, the bankruptcy court could summarily take possession of the property and summarily determine the validity of liens claimed thereon. The situation here is quite otherwise. One effect of the action brought by Myers against Buchhalter and others, out of which these cases grew, was to foreclose a mortgage. The mortgage or trust deed had become a valid lien much more than four months before the petition in bankruptcy was filed and it follows therefore that the receiver having taken possession of the mortgaged property under jurisdiction of the state court the federal court was powerless to dispossess him. 1 Collier on Bankruptcy (13th Ed.), p. 803, et seq.; *In Re*

*Rathman* (C. C. A. 8), 183 F. 913, 25 Am. B. R. 246. The question which controls is, not when the bankruptcy proceedings were commenced, but when was the lien acquired which the state court is enforcing. Such being the law, as I believe it to be, the conclusions reached as to the effect of the bankruptcy proceedings upon the rights and duties of Beck and his counsel are unsound.

I am in serious disagreement with the court as to its orders concerning the fees of the receiver. I do not read or understand the evidence as have my brethren. In my opinion the good faith of Beck has been attacked without proper ground, and there is ample and uncontradicted testimony indicating that he did act in good faith, attempted at all times to protect the interests of all creditors, and carried on his duties with industry, intelligence and honesty of mind and purpose. I will not undertake to make an extensive review of his acts for I believe a short statement will be sufficient. From the date of his appointment, May 17, 1927, to the making of his final report, October 22, 1929, he received from sales of the company's products, made under his supervision, $712,880.98. He conducted the sale approved by the trial court which involved $228,000, making a total handled during his tenure of $940,880.98. His total fees, whether as receiver or as general manager, and I think it makes no difference how we name them, were $20,000, or slightly more than 2 per cent of the volume handled. The total of attorneys' fees allowed was $10,590, slightly more than 1 per cent. How it can be said these allowances were unreasonable I cannot understand. By analogy to the amounts allowed administrators of estates and their attorneys, Beck, Ginsberg, Gobble and Walker were vastly underpaid. In states in which fees of receivers are fixed by statute 5 per cent is the amount commonly authorized. My judgment is that the fees allowed were entirely reasonable and that it is a grave injustice to Beck to reduce them and order repayment. It should be recalled that this court has from the very first said that this receiver-

ship should continue and has repeated that ruling in the opinion in the Rossi case (paragraphs 1 and 2). Beck is truly in an unfortunate position. With the continued approval of this court the receivership has gone on; no party has asked his removal or, until the time of the latest sale, seriously considered it; he has with the tacit or actual consent of all operated the plant; and now, at last, after all these weary years he is obliged to pay back three-fourths of his paltry 2 per cent. And yet, as is undisputed in the record, the expenses of operation under Beck's receivership were uniformly less than under the company's own management. It is true, as has been charged against him, that the company did not profit under his control, but I know of very few cases in which receiverships have proven to be profitable. Their purpose is to effect the payment of debts usually by the process of depriving a great many creditors of their claims, thus paving the way for a reorganization free from excessive burdens. And in the case of this receivership if items aggregating some $6,000 not properly chargeable to the expense of the receivership are eliminated, Beck's management shows a small net profit.

In the several opinions in these cases certain of counsel are praised and others criticized. In my judgment these things should be eliminated. It is not, I think, a proper exercise of judicial power and duty to award certificates of good conduct or indulge in castigation. If reward is due to the lawyers so praised they will receive it in the nature of their practices. If criticism is warranted elaborate machinery is at hand to punish, but it is unjust in the course of an opinion which will be ever open to public inspection to make reflections upon men powerless to present anything in their defense or to exhibit facts in mitigation.

While this opinion is filed in No. 12,590, *The George N. Sparling Coal Company v. Colorado Pulp and Paper Co.*, 88 Colo. 523, 299 Pac. 41, the expressions therein are intended to be applicable as well to No. 12,283, *Myers v.*

For so many of the foregoing reasons as are relevant to the issues in these cases I am of the opinion rehearings should be granted.